# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| Sherry Brown and Ericka Newby, *on their own behalf and on behalf of all others similarly situated*, | : <br> : <br> : <br> : |
| Plaintiffs, | : CIVIL ACTION NO: 15-CV-3509-TJS |
| v. | : <br> : The Hon. Timothy J. Savage |
| Rita's Water Ice Franchise Company LLC, *a Pennsylvania Limited Liability Company*, | : <br> : <br> : |
| Defendant | : <br> : |

## PLAINTIFFS' MOTION AND MEMORANDUM IN SUPPORT OF APPROVAL OF CLASS REPRESENTATIVE INCENTIVE AWARDS AND <u>FOR REASONABLE ATTORNEYS' FEES AND COSTS</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... iv

I.      INTRODUCTION ..............................................................................1

II.     FACTUAL AND PROCEDURAL BACKGROUND .........................2

        A.      The TCPA and its implementing Regulations ......................2

        B.      Plaintiffs' Allegations and Proposed Class Counsels' Investigation of the Claims ....................................................................................4

        C.      Litigation, Early Settlement Discussions, and the Private Mediation Process .5

        D.      Terms of the Settlement Agreement and Provision for Reasonable Attorneys' Fees and Incentive Awards ...............................................7

III.    ARGUMENT ..................................................................................10

        A.      Class Counsels' request for attorneys' fees of one-third of the $3 million settlement fund is demonstrably reasonable: 33% is consistent with awards in comparable cases in the Third Circuit and the entire fund is being paid out to Settlement Class Members who file timely claims ..............................12

                1.      The size of the fund represents the maximum amount of money that could have been secured for the Settlement Class Members ..............12

                2.      The reaction of the Class to date has been overwhelmingly positive ..13

                3.      The skill and efficiency of the attorneys involved support the requested attorneys' fees .......................................................13

                4.      The complexity and duration of the litigation supports the request for attorneys' fees ........................................................14

                5.      As Class Counsel took this case on contingency against a company with limited resources, the risk of nonpayment supports the fee award ....................................................................................15

                6.      The substantial time devoted to the case by Class Counsel also supports the fee award .................................................16

                7.      An award of one-third of the Settlement Fund is comparable to awards in similar cases ...............................................17

**8.      The value of benefits conferred by counsel, the percentage counsel would have negotiated as fee had representation been undertaken on contingency basis, and any innovative terms of settlement all support the requested attorneys' fees**................................................................**18**

**B.      Class Counsels' request for attorneys' fees is also supported by cross-checking the amount against their lodestar—only a 1.47 multiplier is requested, which is well within the range applied by courts in the Third Circuit** ................................................................................................**19**

**C.      The Court should approve Class Counsels' current expenses of $40,073.97** ................................................................................................**23**

**D.      The Court should also approve the Class Representative Incentive Awards** ....................................................................................................**23**

**IV.      CONCLUSION** ...............................................................................................**24**

## <u>TABLE OF AUTHORITIES</u>

*Bradburn Parent Teacher Store, Inc. v. 3M (Minnesota Mining & Mfg. Co.)*,
    513 F. Supp. 2d 322 (E.D. Pa. 2007) ...............................................................18

*Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980).............................................................13

*Bridgeview Health Care Ctr., Ltd. v. Jerryclark*, 2015 WL 4498741 (N.D. Ill. 2015) ................17

*Brytus v. Spang & Co.*, 203 F.3d 238 (3d Cir. 2000).....................................................11

*Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136 (E.D. Pa. 2000) .................................23

*Erie Cty. Retirees Ass'n v. Cty. Of Erie, Pennsylvania*,
    192 F. Supp. 2d 369 (W.D. Pa. 2002)....................................................11, 20

*Evankavitch v. Green Tree Servicing, LLC*, 793 F.3d 355 (3d Cir. 2015) ......................................3

*Gragg v. Orange Cab Co., Inc.*, 2013 WL 1788479 (W.D. Wash. 2013) ......................................3

*Grant v. Capital Mgmt. Srvs., L.P.*, 2011 WL 3874877 (9th Cir. 2011) ........................................3

*Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190 (3d Cir. 2000)...................................10, 11, 21

*Hageman v. AT & T Mobility LLC*, 2015 WL 9855925 (D. Mont. 2015) ....................................17

*In re AT & T Corp.*, 455 F.3d 160 (3d Cir. 2006).....................................................11, 18

*In re Cendant Corp. Litig.*, 264 F.3d 201 (3d Cir. 2001).........................................11, 20

*In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722 (3d Cir. 2001) ...................................13, 20, 22

*In re Corel Corp. Inc. Sec. Litig.*, 293 F. Supp. 2d 484 (E.D. Pa. 2003) .......................................18

*In re Diet Drugs*, 582 F.3d 524 (3d Cir. 2009) ...........................................................10

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig.*,
    55 F.3d 768 (3d Cir. 1995)...........................................................11, 20

*In re Greenwich Pharm. Sec. Litig.*, 1995 WL 251293 (E.D. Pa. 1995) ......................................18

*In re Linerboard Antitrust Litig.*, 2004 WL 1221350 (E.D. Pa. 2004) ..................................23, 24

*In re Prudential Ins. Co of America Sales Practice Litig.*,
    148 F.3d 283 (3d Cir. 1998)...........................................................11, 18, 20

*In re Residential Doors Antitrust Litig.*, 1998 WL 151804 (E.D. Pa. 1998) ..............................24

*In re Rite Aid Corporation Securities Litig.*, 396 F.3d 294 (3d Cir. 2005)................11, 12, 20, 21

*In re SmithKline Beckman Corp. Sec. Litig.*, 751 F. Supp. 525 (E.D. Pa. 1990)..........................18

*In re Sterling Fin. Corp. Sec. Class Action*, 2009 WL 2914363 (E.D. Pa. 2009) ........................18

*Kolinek v. Walgreen Co.*, 311 F.R.D. 483 (N.D. Ill. 2015) ...........................................17

*Landsman & Funk, P.C. v. Skinder-Strauss Associates*, 2016 WL 611441 (3d Cir. 2016) .........17

*Lees v. Anthem Ins. Companies Inc.*, 2015 WL 3645208 (E.D. Mo. 2015) ...........................17, 24

*McDonough v. Toys R Us, Inc.*, 80 F. Supp. 3d 626 (E.D. Pa. 2015).......................................11, 18

*Milliron v. T-Mobile USA, Inc.*, 423 F. App'x 131 (3d Cir. 2011)................................................20

*Mims v. Arrow Financial Svcs's, LLC*, 132 S. Ct. 740 (2012) .......................................................2

*Saf-T-Gard Int'l, Inc. v. Seiko Corp. of Am.*, No. 09 C 0776 (N.D. Ill. 2011)  ............................17

*Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009) ................................................2

*Smith v. Dominion Bridge Corp.*, 2007 WL 1101272 (E.D. Pa. 2007) ....................................11, 18

*Spine & Sports Chiropractic, Inc. v. ZirMed, Inc.*, 2015 WL 9413143 (W.D. Ky. 2015)  ...........17

*Vandervort v. Balboa Capital Corp.*, 8 F. Supp. 3d 1200 (C.D. Cal. 2014)...................................17

## STATUTES, RULES AND REGULATIONS

47 U.S.C. § 227 (2015) ................................................................................................... *passim*

47 C.F.R. § 64.1200 (2013) ....................................................................................................3

## I.  INTRODUCTION

The class action Settlement Agreement reached in this Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq*. ("TCPA") case is an outstanding resolution that provides Settlement Class Members with both meaningful prospective relief and the opportunity to receive significant monetary payments. Indeed, under the terms of the Settlement, Rita's will establish a Settlement Fund totaling three million dollars ($3,000,000.00 USD) from which Settlement Class Members who submit valid claims will be entitled to cash payments. The amount of each claim will depend upon the number of claims eventually filed—and are projected to range from approximately $90 - $1,000—depending on the circumstances surrounding the claimant's receipt of the text messages. Also, the Settlement secures prospective relief that will: (i) enhance the Defendant's disclosures contained on its online Cool Alerts webpage, and (ii) ensure that Rita's honors STOP requests sent by consumers on a going-forward basis. In total, the Settlement provides significant relief to Class Representatives Brown and Newby as well as to the members of the Settlement Class.

Notice detailing the terms of the Settlement Agreement has been sent to over 105,000 Settlement Class Members (and more notices are being re-mailed) and the response has been overwhelmingly positive. (*See* Declaration of Attorney Steven Woodrow ("Woodrow Decl.") ¶ 25, a true and accurate copy of which is attached hereto as Group Exhibit A-1.). At last count, the claims administrator has received approximately 17,472 valid claim forms. (*Id*.) There have been no objections submitted and there has been just one request to be excluded. (*Id*.)

Such impressive results did not occur by happenstance. Quite the contrary, they are the direct result of meaningful time, effort, and energy devoted to the litigation by Settlement Class Counsel and the Class Representatives. Indeed, the Settlement Agreement and its favorable terms

1

were made possible by Class Counsels' work investigating and prosecuting the case, negotiating the terms through a formal, extensive mediation process, and expending hundreds of hours (and thousands of dollars in out-of-pocket costs) on the litigation.

In recognition for this work, the Settlement Agreement calls for an attorneys' fee award of one-third of the Settlement Fund ($1,000,000 USD). This amount is reasonable when analyzed as a percentage of the benefits conferred as well as when cross-checked against Class Counsels' lodestar, which by the end of the case is projected to equal $653,182. (*See* Section III.B, *infra*.) Likewise, the Settlement Agreement calls for Class Representative incentive awards of $5,000 each, which are reasonable and consistent with typical awards in consumer class actions.

As such, and as explained in further detail below, the Court should approve an award of fees and expenses equal to one-third of the $3,000,000 Settlement Fund as well as Incentive Awards for the Class Representatives of $5,000 each.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    The TCPA and its implementing Regulations.

A brief summary of the law that forms the basis of Plaintiffs' claims helps put the request for attorneys' fees in proper context. Congress enacted the TCPA in 1991 as a response to "[v]oluminous consumer complaints about abuses of telephone technology…." *Mims v. Arrow Financial Svcs's, LLC*, 132 S. Ct. 740, 744 (2012). In enacting the TCPA, Congress sought to "protect the privacy interests of telephone subscribers." *Satterfield v. Simon & Schuster*, *Inc.*, 569 F.3d 946, 954 (9th Cir. 2009); *see also Mims,* 132 S. Ct. at 745. Courts have uniformly held that the TCPA applies with equal force to the making of text message calls as it does to the making of voice calls to cellular phones. *Satterfield,* 569 F.3d at 954.

To prevail, a plaintiff must show that a person: (1) made text message calls, (2) using an

Automatic Telephone Dialing System (ATDS)[1], (3) to a telephone number assigned to a cellular telephone service. *See* 47 U.S.C. § 227(b)(1)(A)(iii). Whether Plaintiffs and other Class members provided their prior express consent to receive such text messages is an affirmative defense. *See e.g.*, *Evankavitch v. Green Tree Servicing, LLC*, 793 F.3d 355, 366 (3d Cir. 2015) (recognizing a defendant's burden of showing prior express consent as an affirmative defense); *see also Grant v. Capital Mgmt. Srvs., L.P.*, No. 11-56200, 2011 WL 3874877, at *1 n.1 (9th Cir. Sept. 2, 2011) ("'[E]xpress consent' is not an element of a TCPA plaintiff's prima facie case, but rather is an affirmative defense for which the defendant bears the burden of proof."). Under the Regulations, prior express consent must "include a clear and conspicuous disclosure" informing the person signing that:

> (A) By executing the agreement, such person authorizes the seller to deliver or cause to be delivered to the signatory telemarketing calls using an automatic telephone dialing system or an artificial or prerecorded voice; and
>
> (B) The person is not required to sign the agreement (directly or indirectly), or agree to enter into such an agreement as a condition of purchasing any property, goods, or services.

47 C.F.R. § 64.1200(f)(8)(i). The TCPA sets statutory damages in the amount of $500 per violation (trebled to $1,500 per text message if the violations are found to have been willful) and provides for injunctive relief prohibiting the further transmission of such messages. *See* 47 U.S.C. § 227(b)(3)(A-B).

---

[1] An ATDS means "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). The FCC, in turn, has explained that equipment that dials or sends texts to a list of numbers is an ATDS, because "'the basic function of such dialing equipment' is the same— 'the capacity to dial numbers without human intervention.'" *Gragg v. Orange Cab Co., Inc.*, C-12-0576, 2013 WL 1788476, at *2 (W.D. Wash. Apr. 26, 2013) (*citing Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 73 Fed.Reg. 6041, 6042 (Feb. 1, 2008)). Rita's has indicated that if the case proceeded it would contest the classification of its text messaging system as an automatic telephone dialing system under the TCPA.

Having put Plaintiffs' claims in legal perspective, a review of the Plaintiffs' claims and the process leading up to the Settlement is demonstrative of the fairness of the Agreement.

**B.     Plaintiffs' Allegations and Proposed Class Counsels' Investigation of the Claims.**

Rita's is a popular international franchise based in Trevose, Pennsylvania, selling many flavors of Italian ice, frozen custard, and other specialty creations. (Woodrow Decl. ¶ 2.) Since 1984, the company, through franchising, has grown to over 600 locations in 25 states and the District of Columbia. (*Id.* ¶ 3.) As indicated above, this case concerns Rita's "Cool Alerts"— emails and text messages to consumers notifying them that their selected flavors are available at their Rita's' location. (*Id.* ¶ 4.) Rita's maintains a page on its website, uniform for all franchisees, that allows customers to indicate which flavors they want to receive notifications about and to indicate whether they want to receive text messages or emails. (*Id.* ¶ 3-4.) Persons who sign up include contact information such as their names, email addresses, and cellphone numbers. (*Id.* ¶ 4.)

Plaintiff Newby signed up for Rita's Cool Alerts in October 2014 via Rita's' website. (*Id.* ¶ 5.) Shortly after receiving a few texts, Newby decided that she did not want to receive them any further, so she responded, "STOP" as instructed by the texts she had received. (*Id.*) But Rita's continued to text her. (*Id.*) Indeed, despite Newby's repetitive requests to have the messages "STOP," Rita's kept sending the text messages to her cellular phone, each time informing her that she should reply STOP to opt-out of receiving such messages. (*Id.*) Newby also sent emails asking for the messages to stop, which also went ignored. (*Id.*)

Plaintiff Brown did not sign up to receive Rita's text messages but received them all the same. (*Id.* ¶ 6.) Like Newby, despite Brown's repeated "STOP" responses, Rita's continued sending additional text messages to her cellphone. (*Id.*)

Newby and Brown separately reached out to two different law firms to learn about their legal rights in the face of such text messages. (*Id*. ¶ 7.) Upon being contacted by Brown, Class Counsel, Sergei Lemberg and Stephen Taylor, promptly and thoroughly commenced an investigation into her claims, including a review of Rita's websites, the text messages, and public information regarding complaints about Rita's. (*Id*.; *see also* Declaration of Attorney Sergei Lemberg (Lemberg Decl. ¶¶ 9-12.) Similarly, upon being contacted by a lawyer for Newby, Class Counsel, Steven L. Woodrow and Patrick H. Peluso, investigated the allegations, reviewed Rita's websites, and prepared pleadings for filing. (Woodrow Decl. ¶ 8.)

Plaintiff Brown filed her class action complaint first (Case No. 2:15-cv-03509-TJS) on June 22, 2015, which was assigned to the Honorable Timothy Savage. (*Id*. ¶ 9.) Plaintiff Newby filed her case separately several weeks later on July 13, 2015, styled *Newby v. Rita's Water Ice Franchise Company, LLC*, 2:15-cv-03880-JHS, which was assigned to Judge Slomsky. (*Id*.)

Following Newby's filing, Plaintiffs' counsel contacted each other and engaged in a series of conferences. (*Id*. ¶ 10; *see also* Lemberg Decl. ¶ 13.) As a result of these conferences, proposed Class Counsel determined that the best way to proceed would be to self-order and cooperate jointly in the prosecution of the litigation. (Woodrow Decl. ¶ 10.) As such, on October 6, 2015, Newby voluntarily dismissed her claims against Rita's. (*Id*. ¶ 11.) The following day, October 7, 2015, an amended complaint was filed in the Brown action that named both Brown and Newby as plaintiffs and added Newby's additional claims regarding Rita's allegedly deficient online disclosures. (*Id*.)

## C.  Litigation, Early Settlement Discussions, and the Private Mediation Process.

Prior to Newby joining the *Brown* Complaint as a named plaintiff, Judge Savage, at the case management conference held on September 9, 2015, indicated that the Parties both had risk

in the case and that the matter should proceed to mediation. (*Id.* ¶ 12.) The Court additionally indicated that it would provide the Parties with a list of recommended mediators. (*Id*.) Counsel for the Parties thereafter discussed both the prospects for resolving the case through a private mediation process and the information each party would need to mediate effectively. (*Id*. ¶ 13.) The Parties thereafter engaged in both formal and informal discovery, which included responding in full to Rita's interrogatories and document requests. (*Id*.)

Similarly, Rita's responded to formal discovery served on it by the named Plaintiffs. (*Id.* ¶ 14.) Through this process, including several meet and confers, Rita's disclosed: (1) the number of unique cellphone users who had signed up on Rita's website for Cool Alerts prior to any updating of the consent language, (2) the total number of text messages sent to such cellphone users, (3) the number of cellphone users who had replied "STOP" to a Rita's text message and thereafter received at least one additional text message, and (4) the total number of "post-STOP" text messages Rita's sent to such persons. (*Id*.) Class Counsel used this information to estimate the size of the class and the extent of Rita's' liability and exposure. (*Id*. ¶ 15.)

Counsel for the Parties ultimately agreed to a mediation session with the Honorable Diane Welsh (Ret.) of JAMS in Philadelphia. (*Id*. ¶ 16-17.) On October 20, 2015, counsel for the Parties convened at JAMS's offices in Philadelphia. (*Id*. ¶ 17.) In addition to its legal counsel, Rita's' Chief Executive Officer, Chief Financial Officer, and Chairman of the Board were present on behalf of Rita's at the mediation session. (*Id*. ¶ 18.) Despite a full day of arm's-length discussions in both joint and private sessions overseen by Magistrate Judge Welsh, the Parties were unable to reach an agreement at that first session regarding the terms of a settlement. (*Id*. ¶ 19.) However, at Judge Welsh's urging, the Parties agreed to reconvene for a second mediation session to be held in December. (*Id*. ¶ 20.) In accordance with this plan, on December 23, 2015,

counsel for the Parties, together with Rita's' management team from the first mediation session, reconvened in Philadelphia for a second full-day mediation with Judge Welsh. (*Id*. ¶ 21.) The Plaintiffs additionally brought along their financial expert, Stephen W. Shulman, CPA, ABV, CFF, CVA, who was retained by Class Counsel to review and analyze Rita's' voluminous financial documents and reports to determine its financial position. (*Id*.) The discussions with Rita's were contentious, and both Parties, at various points, expressed a willingness to leave the negotiating table. (*Id*.)

With Magistrate Judge Welsh's assistance, however, the Parties were ultimately able to reach an agreement in principle with respect to a settlement framework. (*Id*. ¶ 22.) Only after the Parties achieved an agreement in principle with respect to the relief to be made available to the Class did the Parties negotiate incentive awards for the Class Representatives and an award of reasonable attorneys' fees for Class Counsel. (*Id*.)

**D.    Terms of the Settlement Agreement and Provision for Reasonable Attorneys' Fees and Incentive Awards.**

The "Settlement Class"—consisting of approximately 130,000 cellphone users—is defined as: all persons[2] in the United States to whom Rita's sent a "Cool Alerts" text message between June 22, 2011 and September 15, 2015. (Settlement Agreement, Art. II, ¶ 29.)

The Settlement requires Rita's to establish a Settlement Fund of three million dollars ($3,000,000.00 USD), nearly all of which is designated to be paid out to the Class to fund the terms of the Agreement, including: (1) the payment of all claims (submitted and paid in accordance with the provisions below), (2) all administrative, notice, and claims expenses (the

---

[2] For the purpose of this definition, the term "person" includes individuals, business entities and partnerships. And for purposes of the settlement, multiple owners or users of a single cellular telephone are deemed to be a single member of the Settlement Class. (Settlement Agreement, Art. II, ¶ 28.)

7

"Settlement Administration Costs"), (3) the incentive awards to the Class Representatives

("Incentive Award"), and (4) any award of reasonable attorneys' fees and reimbursement of

expenses ("Attorneys' Fees and Costs") as approved by the Court. (*Id.* ¶ 32.)

  Each Settlement Class Member who submits a valid and timely claim form shall be

eligible to receive a "Claimant Payment" determined by the following formula:

-  (a) Class members who signed up to receive "Cool Alerts" text messages via a Rita's website who file Valid Claim Forms shall receive one (1) "Award Unit";

-  (b) Class members who received text messages after requesting that the messages STOP who file Valid Claim Forms shall receive ten (10) Award Units;

-  Any claimant who experienced both (a) and (b) above will receive eleven (11) Award Units;

-  Each Award Unit will have an equal monetary value, determined by dividing the net Settlement Fund (calculated as the total Settlement Fund less Settlement Administration Costs, the Attorneys' fees and Costs and the Incentive Award) by the total number of Award Units (calculated based upon the number of eligible claiming Class Members).

  If the Court grants this Motion and awards one-third of the fund in fees and costs plus

$10,000 total in incentive awards, and taking into account administrative costs of $150,000, the

net Settlement Fund available to the Settlement Class will be $1,840,000. At last count, 17,472

claims had been filed worth a total of 19,582 award units (211 claimants have claims worth 11

units each, 17,261 claimants have 1 unit each), representing an impressive claims rate. (Lemberg

Decl. ¶ 17.) If no additional claims are filed (which is highly improbable given the enthusiastic

response of the Settlement Class) then the Settlement Fund will be dispersed as follows:

  211 x 11 (Award Units) = 2,321

  17,261 x 1 (Award Units) = 17,261

  Total Award Units = 19,582

Award Unit Value = $93.96 (Net Settlement Fund/Total Award Units or
$1,840,000/19,582)

Thus, each person who signed up under faulty consent language would receive $93.96. Each

person who experienced faulty language and couldn't stop the messages will receive a total of

$1,033.60. Hence, Settlement Class Members who file timely claims stand to potentially receive

substantial payments.

Checks for the Claimant Payments shall be valid for sixty (60) days after issuance. Any

funds associated with Benefit Checks not cashed by class members within that time, following

an attempt at re-mailing to the address on file or to any updated address, determined by using the

National Change of Address Registry, will remain in the Settlement Fund. Monies remaining in

the Settlement Fund on account of uncashed Benefit Checks and any interest earned on the

monies in the Settlement Fund will belong and be paid to Rita's seventy (70) days following the

final issuance of the Benefit Checks.

Additionally, Rita's has also agreed to change its online Cool Alerts disclosures. For a

period of twelve (12) months starting from the date the Settlement becomes final, Rita's, to the

extent it chooses to resume sending Cool Alerts text messages, will include the following written

disclosure on its web pages where consumers enter their phone numbers to receive Cool Alerts:

> By [clicking/signing] below and providing my mobile phone number above, I agree
> and authorize Rita's to deliver or cause to be delivered to me marketing and other
> text messages sent using an automatic telephone dialing system, and I understand
> that I am not required to click below or provide my mobile phone number above
> (directly or indirectly), or to agree to enter into any such agreement as a condition
> of purchasing any property, goods, or services.

(Settlement Agreement Art. III, ¶ 1.g.)

The Settlement Agreement provides that Rita's will not oppose an application submitted

by Plaintiffs for incentive awards to each of the Plaintiffs Brown and Newby, as representatives

9

of the Settlement Class, subject to Court approval, Class Representative Incentive Awards of five thousand dollars ($5,000 each, or a total of $10,000) (the "Incentive Award"). (Settlement Agreement Art. VI, ¶ 2.b.) The Settlement Agreement provides that Rita's will not oppose an application submitted by proposed Class Counsel for an award of one-third (1/3) of the Settlement Fund (33.33% x $3,000,000 = $1,000,000) in Attorneys' Fees and for reimbursement of expenses and costs associated with the Action (currently $40,073.97 but will increase when costs of final approval hearing are included). (*Id.*, ¶ 1.) Any Attorneys' Fees and Expenses shall be subject to court approval and paid from the Settlement Fund prior to the *pro rata* distribution of benefits to the Settlement Class.

As such, the Parties arm's-length negotiations proved fruitful—the result is an impressive settlement that confers real benefits on Settlement Class Members who file claims. Given such results, and in light of the fee award's reasonableness when judged against the *Gunter* factors and Class Counsels' lodestar, the Court should approve the requested attorneys' fees of one third of the Settlement Fund.

## III.   ARGUMENT

When considering attorneys' fees in common fund settlements in the Third Circuit, "the percentage-of-recovery method has long been preferred" over the lodestar method.[3] *See, e.g., Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000) (outlining the seven "*Gunter* factors", analyzed below, that courts must consider when determining the

---

[3] Operating as an exception to the American Rule, the common fund doctrine "provides that a private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation, including attorneys' fees." *In re Diet Drugs*, 582 F.3d 524, 540 (3d Cir. 2009) (*citing In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 187 (3d Cir. 2005)) (internal quotations and citations omitted).

reasonableness of the requested percentage); *see also Brytus v. Spang & Co.*, 203 F.3d 238, 243 (3d Cir. 2000); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig.*, 55 F.3d 768, 821 (3d Cir. 1995); *In re Prudential Ins. Co. of America Sales Practice Litig.*, 148 F.3d 283, 333-34 (3d Cir. 1998) ("The percentage-of-recovery method is generally favored in cases involving a common fund, and is designed to allow courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure") (internal quotations and citations omitted); *In re AT & T Corp.*, 455 F.3d 160, 164 (3d Cir. 2006) (same) (internal quotation marks omitted); *see also In re Rite Aid Corporation Securities Litig.*, 396 F.3d 294, 300 (3d Cir. 2005) *as amended* (Feb. 25, 2005).[4] As discussed below in Section III.A.7, appropriate percentages routinely range from one-third up to as high as 45 percent of a common fund. *McDonough v. Toys R Us, Inc.*, 80 F. Supp. 3d 626, 653 (E.D. Pa. 2015) (collecting cases); *Smith v. Dominion Bridge Corp.*, No. 96-7580, 2007 WL 1101272, at *9 (E.D. Pa. Apr. 11, 2007) (same).

The lodestar calculation is not ignored, however. Rather, the Third Circuit suggests a "lodestar/multiplier" cross-check which may adjust the percentage award if it would require an unreasonable multiplier. *See In re Rite Aid Corp.*, 396 F.3d at 300; *In re Cendant Corp. Litig.*, 264 F.3d 201, 215, 256 (3d Cir. 2001); *In re Gen. Motors Corp.*, 55 F.3d at 821; *see also Erie Cty. Retirees Ass'n v. Cty. of Erie, Pennsylvania*, 192 F. Supp. 2d 369, 377-78 (W.D. Pa. 2002).

---

[4] Commentators have noted that "one purpose of the percentage method" of awarding fees—rather than the lodestar method, which arguably encourages lawyers to run up their billable hours—"is to encourage early settlements by not penalizing efficient counsel. . . ." *Gunter*, 223 F.3d at 198 (*citing* Manual for Complex Litigation, supra, § 24.121, at 207, citing 3 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 14.03, at 14-3 to 14-7 (3d ed. 1992)).

As set forth below, Class Counsels' request for one-third of the $3 million Settlement Fund is fully supported by the *Gunter* factors, additional considerations, and counsels' lodestar.

**A.    Class Counsels' request for attorneys' fees of one-third of the $3 million settlement fund is demonstrably reasonable: 33% is consistent with awards in comparable cases in the Third Circuit and the entire fund is being paid out to Settlement Class Members who file timely claims.**

In determining an appropriate attorney fee award under the percentage-of-recovery approach, courts are guided by the seven well-known "*Gunter*" factors: (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases. *In re Rite Aid Corp.*, 396 F.3d at 301 (*citing Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n. 1 (3d Cir. 2000)). These factors "need not be applied in a formulaic way ... in certain cases, one factor may outweigh the rest." *Id.*

As set forth below, each of these factors, plus additional considerations, supports granting the requested attorneys' fees.

**1.    The size of the fund represents the maximum amount of money that could have been secured for the Settlement Class Members.**

The first factor examines the size of the fund. Applied here, $3 million represents the maximum dollar amount Rita's could afford to pay.[5] Any greater amount would call into

---

[5] As set forth in the Declaration of Attorney Steven Woodrow, Rita's disclosed voluminous information regarding its financial condition, including detailed financial records and tax information, potential (yet ultimately inapplicable) insurance policies, and other data regarding its financial condition. Based on this information, and the analysis conducted by Class Counsels' forensic accounting expert, Stephen Schulman, Class Counsel can represent that Rita's was simply unable to fund a larger Settlement. (Woodrow Decl. ¶ 21.)

question the company's ability to continue as a going concern. As such, because there were no additional monies, the size of the fund supports the requested attorneys' fees.

This factor also looks at the number of persons benefitted. Here, Class Counsel not only secured benefits for the consumers most affected by Rita's unwanted text messages—cellphone users who unsuccessfully responded "STOP"—the Agreement also benefits consumers who admittedly signed up to receive Cool Alerts (albeit under improper language). Further, absent unusual circumstances a smaller common fund <u>increases</u> the percentage of recovery. *See In re Cendant Corp. PRIDES Litig.,* 243 F.3d 722 (3d Cir. 2001) (Emphasis added.)[6] $3 million, while substantial, does not equal hundreds of millions of dollars so as to warrant a smaller percentage.

As such, the Settlement Agreement secures the maximum funds that could have been obtained, and the first factor weighs in favor of approving the requested attorneys' fees.

### 2. The reaction of the Class to date has been overwhelmingly positive.

At this time the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel is unknown—although no objections to the settlement's terms has been received, several weeks remain before the objection deadline of July 8, 2016. As such, objections to the settlement or to the request for attorneys' fees, if any, will be addressed in Class Counsels' forthcoming Motion for Final Approval of Class Action Settlement (which is due to be filed on July 15, 2016). Having said that, it should be noted that at the time of

---

[6] To be sure, under the percentage-of-recovery approach, the Court should look at the amount of fees requested in relation to the total settlement benefits conferred, regardless of whether those benefits are actually claimed. *See e.g., Boeing Co. v. Van Gemert*, 444 U.S. 472, 480-81 (1980); 2 NEWBERG § 1.18 ("[I]t is now settled that class counsel may seek a fee award based on the total potential benefit to the class, rather than being limited by the total amount of claims actually exercised by class members.").

the filing of this motion that over 17,400 claims have been filed, no objections have been received, and only a single person has opted out. That is plainly favorable.

### 3. The skill and efficiency of the attorneys involved support the requested attorneys' fees.

Class Counsel are well-respected members of the legal community, have significant experience litigating similar TCPA class actions, and have frequently been appointed lead class counsel by courts throughout the country. (Woodrow Decl. ¶ 27.)

Class Counsel have diligently investigated, prosecuted, and dedicated substantial resources to the investigation and prosecution of the claims at issue in this case, and towards the settlement, and will continue to do so throughout the pendency of both. (*Id.* ¶¶ 28.) Considering the depth and breadth of the information exchanged and the fact that they retained a financial expert, Class Counsel invested time to ensure that they were (and are) well versed in both the facts of the case and the elements of the Class's legal claims and Defendant's defenses. (*Id.*) It was with this knowledge that proposed Class Counsel successfully negotiated the Settlement on terms that are favorable to the Class and were achieved efficiently, through a minimal use of the Court's limited resources. (*Id.*) Indeed, promptly after the case was filed the firms comprising Class Counsel worked to self-order. (*Id.*) Further, Class Counsel pushed for early settlement discussions and vigorously prepared for the two mediation sessions that resulted in the Settlement. (*Id.*) Consequently, the skill and efficiency of the attorneys supports the requested fees.

### 4. The complexity and duration of the litigation supports the request for attorneys' fees.

This litigation was filed a year ago. While the Parties commenced their settlement discussions early on in the case, the intricacy and nature of the litigation still support the request for attorneys' fees. Counsel for the parties exchanged voluminous discovery on both formal and

informal bases prior to and throughout the mediation process, including discovery regarding the size and scope of the class, the strength of the claims (including a review of Rita's relationships with its franchisees and their text messaging system), and Rita's ability to satisfy any judgment. This information was not only reviewed and analyzed internally by counsel, the financial information was shared with Class Counsel's forensic accountant, who further dissected the data so as to ensure Class Counsel did not leave any additional funds on the table that could have been secured for the Class Members.

In addition, Class Counsel was required to prepare for two (2) full-day mediation sessions with Magistrate Judge Welsh (Ret.) of JAMS in Philadelphia. Substantial work was performed in advance of both sessions so as to ensure that the settlement class members would be represented in the discussions by knowledgeable advocates. And, of course, meaningful work was performed following the mediation to finalize the Settlement, including preparing all documents for the Court's approval, working with the settlement administrator to launch the Settlement Website and disseminate the Class Notice, and responding to inquiries made by Class Members and attorneys general.

As such, although the parties started their settlement discussions early (at the Court's urging), the complexity of those negotiations and of the litigation more generally cannot seriously be questioned.

> **5.      As Class Counsel took this case on contingency against a company with limited resources, the risk of nonpayment supports the fee award.**

The fifth factor, which assesses the risk of nonpayment, also weighs in favor of granting the requested attorneys' fees. Class counsel has not been paid hourly for their services. Rather, their agreements with the two named plaintiffs show that they assumed the risk of nonpayment in

this case by taking the matter on a contingency basis. (*Id*. ¶ 29.) And although Class Counsel viewed the merits of the case as being relatively strong, that by no means ensured that they would be compensated for bringing the action. Rita's hired experienced counsel and repeatedly expressed a willingness to vigorously defend the matter. As the Court is aware, even the strongest cases have faults, and even large jury verdicts are not immune from being overturned following appellate review.

Furthermore, given the nature of the allegations, a "successful" prosecution of the case would have resulted in a billion-dollar judgment, causing Rita's to become insolvent and judgment proof. Rather than confer any direct benefits on the class members, such an outcome would have likely denied—or at the very least substantially delayed by several years—the class members' ability to recover any amounts.

As such, this factor also supports granting the requested attorneys' fees.

> **6.  The substantial time devoted to the case by Class Counsel also supports the fee award.**

As indicated above with respect to the complexity of the case and the duration of the litigation, and as set forth more completely below with respect to the lodestar cross-check, Class Counsel has devoted substantial time and resources to prosecuting the case, negotiating the Settlement Agreement, and seeing the resolution through to completion. All told, three plaintiffs firms combined on this case and expended a total of 1,443.1 hours pursuing the litigation and resolution. The work performed on this case necessarily prevented Class Counsel from pursuing other matters, including hourly work that does not carry a concomitant risk of nonpayment. (Woodrow Decl. ¶ 29.) Consequently, the time that Class Counsel have and continue to devote to the case supports the requested attorneys' fees.

16

And as a final point here, the time spent is in addition to the $40,073.97 that Class Counsel have incurred to date in out-of-pocket costs and expenses. On top of relatively standard filing and service charges, such expenses in this case include the costs of the mediation sessions, the costs of Plaintiffs' financial expert—which was necessary given Rita's repeated claims of being unable to finance a settlement—and travel expenses for the mediations and hearings (and will increase with travel for the fairness hearing).

This factor therefore supports the requested attorneys' fees as well.

### 7.   An award of one-third of the Settlement Fund is comparable to awards in similar cases.

Courts considering TCPA class action settlements wherein a common fund is established routinely award one-third of the settlement fund as reasonable attorneys' fees. *See Landsman & Funk, P.C. v. Skinder-Strauss Associates*, No. 15-2485, 2016 WL 611441, at *3 (3d Cir. Feb. 16, 2016) (unpublished decision) (affirming award of one-third of reversionary settlement fund in TCPA class action settlement where requested fees were twice the amount of Class Counsels' lodestar); *Bridgeview Health Care Ctr., Ltd. v. Jerryclark*, No. 09 C 5601, 2015 WL 4498741, at *2 (N.D. Ill. July 23, 2015) (awarding one-third of common fund in TCPA class action); *Hageman v. AT & T Mobility LLC*, No. CV 13-50-BLG-RWA, 2015 WL 9855925, at *4 (D. Mont. Feb. 11, 2015) (approving fee award of "$15 million, or one-third of the common fund recovery" in TCPA class action settlement against AT&T); *Saf–T–Gard Int'l, Inc. v. Seiko Corp. of Am.*, No. 09 C 0776 (N.D. Ill. Jan. 14, 2011) (awarding one-third of common fund in multimillion dollar TCPA class action); *Vandervort v. Balboa Capital Corp.*, 8 F. Supp. 3d 1200, 1210 (C.D. Cal. 2014) ("Accordingly, the Court awards attorneys' fees and costs in the amount of $1.1 million, or 33% of the $3.3 million settlement fund ceiling amount."); *Lees v. Anthem Ins. Companies Inc.*, No. 4:13CV1411 SNLJ, 2015 WL 3645208, at *4 (E.D. Mo. June 10, 2015)

17

(Approving fees in TCPA settlement representing "34% of the actual fund available to Class Members."); *Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 501 (N.D. Ill. 2015), *appeal dismissed* (Jan. 27, 2016), *appeal dismissed* (Feb. 1, 2016), *appeal dismissed* (Feb. 3, 2016) (awarding 36% of common fund in TCPA class action settlement); *Spine & Sports Chiropractic, Inc. v. ZirMed, Inc.*, No. 3:13-CV-00489, 2015 WL 9413143, at *1 (W.D. Ky. Dec. 22, 2015) (approving one third of fund as attorneys' fees).

Likewise, a fee award of one-third of the Settlement Fund is consistent with awards approved in consumer class actions more generally. *In re Greenwich Pharm. Sec. Litig.*, No. 92-3071, 1995 WL 251293 (E.D. Pa. Apr. 26, 1995) at *6–7 (awarding fee of 33.3%); *In re SmithKline Beckman Corp. Sec. Litig.*, 751 F. Supp. 525, 533 (E.D. Pa. 1990) (noting range of fees from 19% to 45%); *Bradburn Parent Teacher Store, Inc. v. 3M (Minnesota Mining & Mfg. Co.)*, 513 F. Supp. 2d 322, 341 (E.D. Pa. 2007) (approving a 35% award for a $39,750,000 common fund); *In re Corel Corp. Inc. Sec. Litig.*, 293 F. Supp. 2d 484, 497 (E.D. Pa. 2003) (approving an award of 33.3% against a $7,000,000 common fund). Indeed, courts award percentages that routinely range from one-third up to as high as 45 percent of a common fund. *McDonough*, 80 F. Supp. 3d at 653 (collecting cases); *Dominion Bridge Corp*, 2007 WL 1101272, at *9 (same); *see also In re Sterling Fin. Corp. Sec. Class Action*, No. 07-2171, 2009 WL 2914363, at *4 (E.D. Pa. Sept. 10, 2009) (approving 30% in fees of $10.25 million fund and stating "the settlement fund is not so large as to support a percentage smaller than thirty percent") (emphasis supplied).

As such, a fee award of one-third falls well within the range of awards approved in TCPA and other consumer class action settlements.

**8. The value of benefits conferred by counsel, the percentage counsel would have negotiated as fee had representation been undertaken on**

**contingency basis, and any innovative terms of settlement all support the requested attorneys' fees.**

In addition to warning against the formulaic application of the *Gunter* factors, courts have also cautioned that *Gunter's* considerations are "not intended to be exhaustive." *In re AT & T,* 455 F.3d at 165; *see also In re Prudential,* 148 F.3d at 340 (noting three additional factors that may be relevant to common-fund fee analysis: value of benefits conferred by counsel as distinguished from benefits conferred by other parties; percentage counsel would have negotiated had representation not been undertaken on contingency basis; and any innovative terms of settlement).

Applied here, such considerations support the requested fees. Class Counsel conferred all of the benefits secured under the Settlement Agreement and took the case on a contingency basis (*see* Woodrow Decl. ¶ 29.) Had such a percentage been negotiable from the outset, Class Counsel would have required 33.33% at a minimum, and more likely would have negotiated a higher amount, such as 40%, which is more consistent with present-day contingency fees.

Finally, the Settlement Agreement contains innovative terms designed to maximize relief to the Settlement Class Members. The Settlement eschews more popular TCPA settlement models—including those that typically feature the creation of a "fund" payable on a claims made basis for discrete amounts[7] with any unclaimed funds reverting back to the defendant—for an agreement that requires Rita's to pay out all $3 million (USD) in the Settlement Fund (with the only exception being uncashed checks, of which there should be very few). Each Settlement Class Member gets between 1 and 11 "units," each of which could be worth $90 or more. As a

---

[7] Per claim payments in TCPA settlements vary widely, from $10 to several hundred dollars, with a typical payment averaging $145. (Woodrow Decl. ¶ 28.)

result, Settlement Class Members who file timely claims are poised to obtain substantial

recoveries when compared to the typical TCPA or other consumer class action settlement.

  **B.**  **Class Counsels' request for attorneys' fees is also supported by cross-checking the amount against their lodestar—only a 1.47 multiplier is requested, which is well within the range applied by courts in the Third Circuit.**

  As explained above, in the Third Circuit, the percentage award is subject to a

"lodestar/multiplier" crosscheck. *See In re Rite Aid Corp.*, 396 F.3d at 300; *In re Cendant Corp.*

*Litig.*, 264 F.3d at 215, 256; *In re Gen. Motors Corp.*, 55 F.3d at 821; *see also Erie Cty. Retirees*

*Ass'n v. Cty. of Erie, Pennsylvania*, 192 F. Supp. 2d at 377-78. "[T]he lodestar cross-check does

not trump the primary reliance on the percentage of common fund method"; rather, it entails

"neither mathematical precision nor bean-counting" and the Court "may rely on summaries

submitted by the attorneys and need not review actual billing records." *In re Rite Aid Corp.*, 396

F.3d at 306-07. "In performing the lodestar cross-check, the district courts should apply blended

billing rates that approximate the fee structure of all the attorneys who worked on the matter." *Id.*

at 306. Furthermore, "[m]ultiples ranging from one to four are frequently awarded in common

fund cases when the lodestar method is applied.'" *In re Prudential,* 148 F.3d at 341 (*quoting* 3

Herbert Newberg & Alba Conte, Newberg on Class Actions, S 14.03 at 14–5 (3d ed.1992)); *In re*

*Cendant Corp. PRIDES Litig.*, 243 F.3d at 742; *see also Milliron v. T-Mobile USA, Inc.*, 423 F.

App'x 131, 135 (3d Cir. 2011) (although "the lodestar multiplier need not fall within any pre-

defined range…we have approved a multiplier of 2.99 in a relatively simple case.")

  Applied here, Class Counsels' total lodestar (current lodestar plus projected future

lodestar) of $653,182 readily serves as a fair crosscheck against the requested percentage award.

Broken down by attorney, Class Counsels' current lodestar is calculated as follows:

| Attorney Name/Firm | Position | Rate | Hours | Lodestar |
|---|---|---|---|---|
| Steven Woodrow/ Woodrow & Peluso | Partner | $430 | 411.4 | $176,902 |
| Patrick Peluso/ Woodrow & Peluso | Partner | $330 | 323 | $106,590 |
| Stefan Coleman/ Law Office of Stefan Coleman | Partner | $450 | 77.7 | $34,965 |
| Sergei Lemberg/ Lemberg Law ("LL") | Partner | $500 | 224 | $112,000 |
| Stephen Taylor/LL | Senior Associate | $450 | 213 | $95,850 |
| Jody Burton/LL | Associate | $450 | 30 | $13,500 |
| Alex Hornat/LL | Associate | $250 | 66 | $16,500 |
| Rebecca Gelozin/LL | Associate | $250 | 37 | $9,250 |
| Paralegal Rate/LL | Paralegal | $125 | 61 | $7,625 |
| **CURRENT LODESTAR** | | | 1,443.1 | $573,182 |

The hours spent to date are manifestly reasonable in light of the work required to attain such a favorable result for the Class.[8] Indeed, from their pre-suit investigation through today Settlement Class Counsel has devoted substantial time and resources to the successful prosecution and resolution of the case, including:

- A pre-suit investigation into the facts and claims, including a review of Rita's franchisee websites and text message delivery systems;

- Drafting and filing the pleadings;

- Coordinating the efforts of three law firms, self-ordering and designing and executing on a successful litigation and settlement strategy;

---

[8] *See Gunter*, 223 F.3d at 200 (describing such a process—of providing time summaries initially, with further billing records to be provided should the court request them—as "consonant with the practice in this circuit."); *In re Rite Aid Corp.*, 396 F.3d at 307 (district court may "rely on summaries.")

- Engaging in early informal and formal discovery (including propounding discovery and responding in full to written discovery), as well as exchanging information through the mediation process;

- Reviewing voluminous financial documents, including financial reports and insurance documents, and working with Class Counsels' retained financial expert to evaluate Rita's financial position as it relates to the litigation;

- Mediating the case through two contentious full-day mediation sessions with Magistrate Judge Diane Welsh (Ret.) of JAMS in Philadelphia;

- Negotiating the settlement and drafting and revising the settlement documents;

- Finalizing the agreement and all related settlement papers and presenting the settlement to the Court for preliminary approval;

- Answering Settlement Class Member inquiries and assisting Settlement Class Members with the claims process;

- Engaging with representatives from a working group of attorneys general and answering and addressing their questions about the settlement; and

- Performing other necessary work to coordinate the efforts of Plaintiffs and their counsel to prepare papers in support of attorneys' fees and final approval.

(Woodrow Decl. ¶ 33; Lemberg Decl. ¶¶ 14-16.) Additionally, Class Counsel project that at least $80,000 worth of additional attorney's time will be needed on this case to see it through beyond final approval and into January 2017 when Settlement Class members are slated to receive checks. (Woodrow Decl. ¶ 34.) Up to that point, and even for a period of time following it, Class Counsel will need to respond to claimant and class member inquiries (particularly given that over 17,400 claims have been filed to date). (*Id.*)

In short, Class Counsel have devoted the past year to the successful investigation, prosecution, and settlement of these claims. In the process they have expended substantial time and have incurred a base lodestar equal to $653,182. For this amount, the total fees being requested, ($1,000,000 - $40,073.97 in expenses = $959,926.03), require only a 1.47 multiplier to justify. That is, the lodestar of $653,182 times 1.47 = approximately $960,000, and a 1.47

multiplier falls well within the range of multipliers that have been recognized as reasonable in this Circuit. *See In re Cendant Corp. PRIDES Litig.*, 243 F.3d at 742 (reiterating that multipliers from 1 to 4 are common).

Accordingly, the requested attorneys' fees represent a multiplier of only 1.47, demonstrating that the requested attorneys' fees are reasonable and should be approved.

### C.    The Court should approve Class Counsels' current expenses of $40,073.97.

The Court should approve Class Counsels' reasonable expenses to date of $40,073.97. These costs reflect Class Counsels' out-of-pocket expenditures incurred in researching and initiating the litigation and engaging in the mediation process and settlement. The two mediation sessions alone cost over $8,000. Additionally, as much of the mediation focused on Rita's claimed inability to pay, Class Counsel was required to retain a financial expert whose services cost over $20,000. (*See* Woodrow Decl.; Lemberg Decl., collectively attached as Group Ex. A.)

Given the results achieved and the fact that the expenses incurred where essential to successfully prosecuting the case and achieving a resolution, the Court should approve the request for reimbursement of expenses in the amount of $40,073.97.

### D.    The Court should also approve the Class Representative Incentive Awards.

Subject to the Court's approval, the Agreement also provides that Plaintiffs Sherry Brown and Erica Newby shall receive incentive awards of five thousand dollars ($5,000.00) each to be paid out of the Settlement Fund. (Settlement Agreement Art. VI, ¶ 2.b.).) "Courts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 145 (E.D. Pa. 2000) (internal citations omitted); *see In re Linerboard Antitrust Litig.*, 2004 WL 1221350, at *18 (E.D. Pa. June 2, 2004) (*citing In re Plastic*

*Tableware Antitrust Litig.*, 2002 WL 188569 (E.D. Pa. Dec. 4, 1998)) ("Like the attorneys in this case, the class representatives have conferred benefits on all other class members and they deserve to be compensated accordingly.").

Here, both Plaintiffs' involvement was critical to the resolution of this litigation and ultimate success of the Agreement. (Woodrow Decl. ¶ 36.) Plaintiffs assisted counsel by helping in the investigation of their claims and providing counsel with valuable information relating to their receipt of Cool Alerts messages. (*Id.*) Plaintiffs' willingness to make the time commitment and undertake the responsibilities and risks involved in bringing a representative action resulted in substantial benefit to their fellow Class members. (*Id.*) The awards sought here are reasonable in light of awards in other cases. *See, e.g.*, *Lees v. Anthem Ins. Companies Inc.*, 2015 WL 3645208, at *4 (approving $10,000.00 incentive award and collecting cases); *In re Linerboard Antitrust Litig.*, 2004 WL 1221350, at *19 (approving incentive awards of $25,000.00 to each of five named plaintiffs); *In re Residential Doors Antitrust Litig.,* No. 94-3744, 1998 WL 151804, at *11 (E.D. Pa. Apr. 2, 1998) (approving $10,000.00 incentive awards to each of four named plaintiffs). Accordingly, the agreed-upon incentive awards are reasonable and should be approved.

## IV.    CONCLUSION

For the reasons set forth above, Plaintiffs and Class Counsel respectfully request that the Court grant this motion and (1) award attorneys' fees and expenses to Class Counsel in the amount of one-third of the Settlement Fund, and (2) award $5,000 as an incentive award to each of the Class Representatives for their role in representing the class.

Dated: June 24, 2016                                  Respectfully submitted,

**Sherry Brown and Erica Newby,** individually and

on behalf of all others similarly situated,


By: /s/ Steven L. Woodrow
     One of Plaintiffs' Attorneys

Sergei Lemberg
Stephen Taylor
Lemberg Law LLC
1100 Summer Street, 3rd Floor
Stamford, CT 06905
Tel: 203.653.2250.ext.5502
Fax: 203.653.3424

Steven L. Woodrow
swoodrow@woodrowpeluso.com
Patrick H. Peluso
ppeluso@woodrowpeluso.com
3900 E Mexico Avenue, Suite 300
Denver, CO 80210
Tel: 720.213.0675
Fax: 303.927.0809

## CERTIFICATE OF SERVICE

I, Steven L. Woodrow, an attorney, certify that, on June 24, 2016, I served the above and foregoing by causing true and accurate copies of such papers to be filed and transmitted to all counsel of record via the Court's CM/ECF electronic filing system and to be posted via a link on the Settlement Website in accordance with the Settlement Agreement on this the 24th day of June, 2016.


/s/ Steven L. Woodrow