**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SHERRY BROWN and ERICKA NEWBY,** | : | **CIVIL ACTION** |
| **on their own behalf and on behalf of** | : | |
| **all others similarly situated** | : | |
| | : | |
| **v.** | : | |
| | : | **NO. 15-3509** |
| **RITA'S WATER ICE FRANCHISE** | : | |
| **COMPANY LLC** | : | |

<u>**MEMORANDUM OPINION**</u>

**Savage, J.**                                                          **March 16, 2017**

When counsel agree to the amount of an attorney fee award in a class action, it is tempting to sign off without conducting a thorough and comprehensive review of the request.  Yet, the dynamics of the settlement process demand we resist the temptation.  Defense counsel, eager to settle a case for a bottom-line figure, has no real interest in how that final payment is distributed among the class members and the attorneys.  Class counsel's interest in maximizing compensation may collide with the interest of the class members who will receive insignificant or nominal sums.  Thus, a court is obliged to conduct a full review of the fee request to ensure that the class is treated fairly and that the outcome of the case will achieve the goals of the statutory remedies without putting the interests of the attorneys over the interests of the class members.

In this Telephone Consumer Protection Act class action, class counsel request one million dollars for attorney fees and expenses, one-third of the settlement fund, the maximum allowed under the Settlement Agreement.  They also seek $5,000 to each of the two class representatives.

We shall grant the motion in part and deny it in part.  We shall approve the

requested expenses and class representative incentive awards.   After conducting a rigorous assessment of the settlement and requested fees in light of the particular facts of this case, we shall reduce the proposed fee award and increase the size of the net fund available to the class members.

### Background

On June 22, 2015, Sherry Brown filed a class action against Rita's Water Ice Franchise Company.   The complaint alleged that Rita's knowingly or willfully sent her unauthorized, automated text messages in violation of the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227.[1]   The text messages, known as "Cool Alerts," announced when certain flavors of products such as water ice, custard, and ice cream became available in the recipient's local store.   Brown alleged that the messages were generated using a list or database of telephone numbers which included numbers of persons who had not provided them to Rita's.[2]   Brown claimed that she continued to receive Cool Alerts after she had repeatedly texted "STOP" in response to the texts' instructions and had emailed Rita's to stop.[3]

Three weeks after Brown filed her action, Ericka Newby filed a similar class action against Rita's.[4]   Like Brown, Newby claimed that she continued to receive Cool Alerts after she repeatedly texted "STOP" in response to the texts' instructions and

---

[1] Compl. (Doc. No. 1).

[2] *Id.* ¶¶ 4, 5, 21, 25.   There is nothing in the record that reveals how Rita's had Brown's phone number.

[3] *Id.* ¶¶ 19, 20.

[4] Decl. of Att'y Steven Woodrow in Supp. of Pls.' Mot. Approval of Class Representative Incentive Awards & for Reasonable Att'ys' Fees & Costs (Doc. No. 46-1) ("Woodrow Decl.") ¶ 9.

contacted Rita's to stop.[5]   Unlike Brown, Newby alleged that she had signed up to receive Cool Alerts on Rita's' website.[6]

Rita's filed a motion to dismiss Brown's complaint or, in the alternative, to strike Brown's class claims.[7]   Before we ruled on the motion, Newby voluntarily dismissed her complaint.[8]   The next day, Brown amended her complaint to add Newby as plaintiff and the allegation that Rita's gave allegedly deficient online disclosures when signing up for Cool Alerts.[9]

Following the pretrial conference, the parties agreed to mediate with a former magistrate judge.[10]   At a second mediation session held on December 23, 2015, the parties reached a settlement framework.[11]   They signed the Settlement Agreement on March 14, 2016.[12]

On March 23, 2016, after a hearing, we granted preliminary approval of the settlement.   We appointed Brown and Newby class representatives. Sergei Lemberg and Stephen F. Taylor, who represented Brown, and Steven L. Woodrow and Patrick H. Peluso, who represented Newby, were appointed class counsel.[13]

The Settlement Agreement, which requires Rita's to fund a three-million-dollar

---

[5] *Id.* ¶¶ 28–33.

[6] 1st Am. Compl. (Doc. No. 25) ¶ 27.

[7] Def. Rita's Water Ice Franchise Co., LLC's Mot. to Dismiss and/or Strike (Doc. No. 18).

[8] Woodrow Decl. ¶ 11.

[9] 1st Am. Compl. at 12–14.

[10] Mot. for Prelim. Approval of Class Action Settlement, Ex. A (Doc. No. 42-3) ("Settlement Agmt.") at 2.

[11] Woodrow Decl. ¶ 22.

[12] Settlement Agmt. at ECF 41–46.

[13] Order (Doc. No. 44) ("Prelim. Approval Order") ¶¶ 16, 17.

settlement, allows class counsel to seek attorney fees and expenses up to one million dollars, one-third of the settlement fund.[14]   It provides maximum class representative incentive awards of $5,000 each for Brown and Newby.[15]   The remainder of the fund "less Settlement Administration Costs" will be distributed to the class.[16]   The net remainder will be divided into "Award Units."[17]   Class members will receive either one or eleven Award Units depending on whether they received another Cool Alert after responding "STOP" to a previous text.   "Settlement Class Members who were sent a 'Cool Alerts' text message and who file a Valid Claim Form," regardless whether they instructed Rita's to stop, will each receive one Award Unit.[18]   "Settlement Class Members who received at least one 'Cool Alerts' text message after texting stop in response to a previously 'Cool Alerts' text message and who file a Valid Claim Form" will each receive ten additional Award Units, for a total of eleven Award Units.[19]   The Settlement Agreement requires Rita's to pay out the entire three-million-dollar fund. Only uncashed checks will revert to Rita's.[20]   The Agreement also requires Rita's to enhance disclosures by providing specific language on its Cool Alerts website.[21]

---

[14] *Id.* ¶ 6; Settlement Agmt. at 11, 31.

[15] Settlement Agmt. at 32.

[16] *Id.* at 12.

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.* at 11, 13.

[21] *Id.* at 13.   The Settlement Agreement provides that Rita's must include the following written disclosure on its Cool Alerts website for twelve months after the settlement becomes final:

By [clicking/signing] below and providing my mobile phone number above, I agree and authorize Rita's to deliver or cause to be delivered to me marketing and other text messages sent using an automatic telephone dialing system, and I understand that I am

The settlement fund administrator identified 110,328 individual names and addresses of class members.  Notices were mailed successfully to 106,493 persons.[22]  In response to the notices, 28,523 class members filed valid claims, representing a claims rate of 25.9%,[23] almost double counsel's projected 13.8% claims rate.[24]  Given this response, if counsel is awarded the full one million dollars, the 28,137 claimants in the first group will each receive $56.81 and the 386 claimants in the second group will each receive $625.01.[25]  When they negotiated the settlement figure, counsel anticipated the value of the individual claims at $90 and $1,000, respectively.[26]

From the three-million-dollar settlement fund, class counsel seeks one million dollars in attorney fees and expenses, and $10,000 in class representative incentive awards, the maximums allowed under the Settlement Agreement.  If counsel's request were approved, there would remain $1.84 million available for distribution to 28,523

---

not required to click below or provide my mobile phone number above (directly or indirectly), or to agree to enter into any such agreement as a condition of purchasing any property, goods, or services.

*Id.*

[22] Decl. of Christina Peters-Stasiewicz (Doc. No. 50-4) ("Peters-Stasiewicz Decl.") ¶¶ 9, 10, 16.  The fund administrator was unable to contact 3,835 class members.

[23] Peters-Stasiewicz Decl. ¶ 20.  In plaintiffs' supplemental brief, counsel cites a claims rate of 20.6% of the class, based on 138,000 class members.  Pls.' Suppl. Br. in Supp. of Pls.' Mot. for Reasonable Att'ys' Fees & Costs (Doc. No. 55) ("Suppl. Br.") at 1.  We had initially found approximately 138,000 class members in the preliminary approval order.  Prelim. Approval Order ¶ 14.  Here, we based the number of class members and the claims rate on the 110,328 unique names and addresses identified by the fund administrator after preliminary approval.  *See* Peters-Stasiewicz Decl. ¶ 10.

[24] Woodrow Decl. ¶ 25; Decl. of Sergei Lemberg in Supp. of Pls.' Mot. in Supp. of Class Representative Incentive Awards & for Reasonable Att'ys' Fees & Costs (Doc. No. 46-1) ("Lemberg Decl.") ¶ 17.

[25] Suppl. Br. at 1 n.1.

[26] Woodrow Decl. ¶ 26.

claimants.[27]

At the final approval hearing, we requested counsel to submit detailed billing records for the purpose of conducting the lodestar cross-check. Brown and Newby filed a supplemental brief addressing attorney fees, expenses and incentive awards, which included the law firms' billing records.[28] We now consider the request for attorney fees.

### Attorney Fees

Attorneys who create a settlement fund for class members are entitled to reasonable compensation from that fund. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). In common fund cases, the percentage-of-recovery method is preferred over the lodestar method for assessing attorney fees. *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 280 (3d Cir. 2009); *Third Circuit Task Force Report on Selection of Class Counsel*, 74 Temp. L. Rev. 689, 775 (2001). The percentage method "allows courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 330 (3d Cir. 2011) (quoting *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005)) (internal quotation marks omitted). It also serves to compensate attorneys who secured a benefit for the class. *See In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 820 n.39 (3d Cir. 1995). It ensures that the class is not unjustly

---

[27] The plaintiffs' motion for attorney fees and expenses states that "the net Settlement Fund available to the Settlement Class will be $1,840,000" after "taking into account administrative costs of $150,000," separate from attorney expenses. Pls.' Mot. & Mem. in Supp. of Approval of Class Representative Incentive Awards & for Reasonable Att'ys' Fees & Costs (Doc. No. 46) ("Mot. for Att'ys' Fees") at 8. The plaintiffs do not explain or substantiate this figure for administrative costs in their briefs. The Settlement Agreement required Rita's to pay $69,000 as an advance against the Settlement Fund to be used by the Settlement Administrator for preliminary settlement administrative costs, including class notices. Settlement Agmt. at 18. We shall allow up to an additional $75,000 for remaining settlement administrative costs.

[28] Suppl. Br. Exs. A, B, C.

enriched at the expense of the attorneys.

In determining the reasonableness of the percentage requested, we consider the

*Gunter* and *Prudential* factors:

> (1) the size of the fund created and the number of beneficiaries, (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel, (3) the skill and efficiency of the attorneys involved, (4) the complexity and duration of the litigation, (5) the risk of nonpayment, (6) the amount of time devoted to the case by plaintiffs' counsel, (7) the awards in similar cases, . . . (8) the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations, (9) the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained, and (10) any innovative terms of settlement.

*In re Diet Drugs*, 582 F.3d 524, 541 (3d Cir. 2009) (citations omitted) (citing *Gunter v.*

*Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000); and *In re Prudential*

*Ins. Co. of Am. Sales Practices Litig. Agent Actions*, 148 F.3d 283, 336–40 (3d Cir.

1998)).

Because each case is different, the non-exhaustive *Gunter* and *Prudential* factors

are not applied in a formulaic manner.  The factors must each be evaluated separately

and then collectively to determine a reasonable fee reflecting the particular

circumstances of the case.  Depending on the facts of the case, one factor may have

more significance and relevance than others.  *Gunter*, 223 F.3d at 195 n.1.  The factors

may overlap and the analysis of one may also be relevant analyzing others.

Even when the percentage method is used, the lodestar method still plays a role

in the reasonableness analysis.  It serves as a cross-check in common fund cases.

*Sullivan*, 667 F.3d at 330; *see also Prudential*, 148 F.3d at 333.  It does not "trump" the

percentage method.  *Rite Aid*, 396 F.3d at 306; *see also Task Force Report*, 74 Temp.

L. Rev. at 776.  Because the lodestar method is only a cross-check, the court may use an abridged lodestar analysis.  *Ins. Brokerage*, 579 F.3d at 280; *see also Task Force Report*, 74 Temp. L. Rev. at 776–77.  At the same time, in cross-checking, the court must be vigilant of "the potential for manipulation of the lodestar."  *Ins. Brokerage*, 579 F.3d at 284; *see also Task Force Report*, 74 Temp. L. Rev. at 777.

After determining the lodestar, we calculate the "multiplier" by dividing the proposed fee award by the resulting lodestar.  *Ins. Brokerage*, 579 F.3d at 280.  The multiplier "attempts to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work."  *Id.* (quoting *Rite Aid*, 396 F.3d at 306).  The multiplier need not fall within a particular range.  *Rite Aid*, 396 F.3d at 307.  What is reasonable in one case may not be reasonable in another case.

Because the settlement provides for a common fund, we apply the percentage method and evaluate the reasonableness of the proposed one-third award using the *Gunter* and *Prudential* factors.  Then, we perform the lodestar cross-check.

*Size of Fund and Number of Beneficiaries*

The size of the settlement fund is not extraordinary.  Nor is the benefit to individual claimants.

Counsel did achieve a modest benefit for the class.  Class members will receive cash awards, not coupons.  Cash settlements are generally valued higher than coupons for class members.  *See, e.g.*, *Gen. Motors*, 55 F.3d at 807.  Counsel deserves credit for pressing for cash payments.

In addition, counsel negotiated benefits not only for persons who received Cool Alerts after unsuccessfully attempting to unsubscribe, but also the larger group of

persons who received Cool Alerts and had not attempted to unsubscribe.[29]   For the larger group, the claims would have been more difficult to prove.   Rita's had a possible consent defense because those in the larger group had signed up to receive Cool Alerts and had not attempted to unsubscribe.   *See* 47 U.S.C. § 227(b)(1)(A) ("It shall be unlawful . . . to make any call (other than a call . . . *made with the prior express consent of the called party* . . . .") (emphasis added).[30]   To their credit, counsel successfully included these individuals in the class and negotiated a cash settlement for them.

The amount each class-member claimant will receive is not significant, but rather modest.   Because the number of claimants exceeded counsel's estimates, each claimant will receive less than anticipated.   Class counsel had initially projected a 13.8% claims rate.[31]   Ultimately, 28,523 class members filed claims,[32] representing a claims rate of 25.9% of the class.   Consequently, the claimants will receive much less than had been anticipated when the parties negotiated the settlement.[33]

Each claimant's potential recovery decreased from an estimated $90 to $56.81 and from $1,000 to $625.01, respectively.   Yet, despite seeking approval of a settlement that will net less to each claimant than was expected, counsel does not propose reducing the attorney fees to bring the claimants' shares closer to the range counsel had estimated when they struck the Settlement Agreement.

Counsel claim that they extracted the largest settlement possible for the class in

---

[29] Settlement Agmt. at 12.

[30] Text messages are "calls" within the meaning of the TCPA.  Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991, 18 FCC Rcd. 14,014, 14,115 (2003).

[31] Woodrow Decl. ¶ 25; Lemberg Decl. ¶ 17.

[32] Peters-Stasiewicz Decl. ¶ 20.

[33] Suppl. Br. at 1 n.1.

light of Rita's' ability to pay.[34]  Yet, rather than adjust the attorney fees to increase the amount available to the class, counsel propose a lesser recovery for the class members.

In summary, counsel obtained a successful, but not an extraordinary, result for the class.  The size of the fund created is not large.  The number of persons benefited is neither significant nor insignificant.  Thus, we conclude that this factor favors an award of fees that is not extraordinary and reflects a reasonable relationship to the individual awards to the claimants.

*Objections by Class Members*

Two class members objected to the settlement.[35]  Only one objected to the attorney fees, stating, "The attorney fees in this case are too high and will take too much of the consumer's money and most consumers do not realize there is a settlement."[36]

Two objections out of 110,328 class members with 28,523 claimants are negligible.  Yet, the objection to the attorney fees has some validity.  Only about a quarter of the class members have filed claims.  Those who did not file a claim may not have done so because, given the small amount of the recovery, it was not worth the effort to pursue a claim.  Those who did file claims may not have been motivated to take the extra step to object to the attorney fees.  A class member could file a claim by submitting a simple form online or through the mail.  A class member could object only by drafting her own detailed objection addressing eleven specifications, including "the

---

[34] Mot. for Att'ys' Fees at 12–13 & n.5.

[35] Peters-Stasiewicz Decl. Ex. D; Obj. to Cool Alert Class Action Settlement Case No. 15-3509 (Doc. No. 53) ("Obj.").  A third class member opted out.  Peters-Stasiewicz Decl. Ex. C.

[36] Obj.

complete legal and factual bases for the Objection."[37]

Even though the absence of many objections mitigates against a reduction of the fee, we must still conduct a "robust assessment" of the proposed attorney fees. Otherwise, we would avoid our responsibility to scrutinize the settlement in light of the relationship of the parties and class counsel.

This is not a case where there are class members who stand to get substantial sums and the attorneys are seeking unusually disproportionate fees.  The motivation for class members to object is not strong.   Nevertheless, the absence of substantial objections weighs against a reduction of the proposed fee.

*Skill and Efficiency of Attorneys*

The percentage method rewards counsel for success and penalizes them for failure.  *Sullivan*, 667 F.3d at 330 (quoting *Rite Aid*, 396 F.3d at 300).  Accordingly, "one purpose of the percentage method is to encourage early settlements by not penalizing efficient counsel."  Fed. Judicial Ctr., Manual for Complex Litigation (Fourth) § 14.121, at 193 (2004); *see also Gunter*, 223 F.3d at 198 (quoting prior edition of the Manual for Complex Litigation).  The lodestar method, by contrast, creates an incentive for counsel to prolong litigation to bill more hours.  *Task Force Report*, 74 Temp. L. Rev. at 706; Manual for Complex Litigation, *supra*, § 14.121, at 188.  In considering the skill and efficiency factor, we seek to reward, not punish, efficient counsel.

Once Brown's complaint was amended to add Newby as a plaintiff and include her claims, Woodrow, Peluso, and a fifth attorney, Stefan Coleman**,** entered

---

[37] *See* Peters-Stasiewicz Decl. Exs. A, B.

appearances in the case.[38]  Even had they not done so, both actions would have been consolidated.  In that event, counsel would have had to cooperate in the litigation and duplicative tasks would not have been rewarded by higher fee awards.

We credit counsel for efficiently merging both cases.  Counsel should not be discouraged from doing what counsel did.  Yet, once they did so, counsel should have taken advantage of the merger.  Instead, perhaps to protect their respective fee interest, both firms remained in the case and performed unnecessarily duplicative work.

Counsel had the opportunity to maximize efficiency.  But, they did not.  Instead, both law firms participated in almost every phase of the litigation.[39]  Although they performed some separate tasks, they engaged in redundant work.

Counsel from each firm spent time performing duplicate work.[40]  For example, four attorneys, two from each firm, attended the two mediation sessions.[41]  Counsel at both firms spent 63.9 total hours analyzing the same financial documents which their financial expert had already analyzed.[42]

In addition to duplicative work, counsel also billed time for matters irrelevant to litigating the case.  They billed 78 hours for travel without claiming they performed work

---

[38] Order (Doc. No. 32); Order (Doc. No. 33); Order (Doc. No. 35).

[39] *See* Suppl. Br. Exs. A, B, C.

[40] For example, counsel's billing narratives show that counsel billed for reading emails in which the billing attorney did not participate; "def[endant] research" about Rita's, including its business model, handled by the other firm; researching forensic accounting firms after counsel already met with expert Shulman; and participation in a conference call with state attorneys general.  Suppl. Br. Exs. A, B. Brown's counsel also billed for preparing discovery responses for Newby, and vice versa.  At the July 26, 2016 hearings, counsel defended the need to duplicate tasks by noting that they represented different plaintiffs.  *See* Oral Arg. Tr. at 3:9–17 (July 26, 2016).

[41] Suppl. Br. Exs. A, B.

[42] *Id.*

on this case during travel.[43]   Unlike their entries for non-travel time, the travel time did not describe any work performed while traveling.   If counsel did actually work during travel, the additional amount of time reflects negatively on counsel's skill and experience.   They also billed 13.6 hours for reviewing bills and paying costs, an administrative chore that could have and should have been done by office staff.[44]

Counsel spent time on irrelevant and unnecessary work.   They recorded 6.9 hours researching a "custard crisis" to investigate whether the price of eggs affected Rita's' ability to pay a settlement.[45]   They spent 27.5 hours researching company officers in their individual capacities, franchisees, and competitors.[46]   They claim 15.3 hours researching and drafting a response in opposition to Rita's' request to the Federal Communications Commission to retroactively waive their TCPA liability under FCC regulations.   They never sent the letter.[47]   These activities were unnecessary.

Inexplicably, counsel spent 47.6 hours researching mediator ethics and alleged ethical violations by the mediator.[48]   Yet, in their motion, counsel praise the mediator for her "help and encouragement"[49] and assisting the parties in reaching a settlement framework.[50]   Not only was this a waste of time and unsupported, it militates against a finding of skill and efficiency.   If there had been a problem, the parties were not

---

[43] Id.

[44] Id.

[45] Id.

[46] Id.

[47] Id.

[48] Id.

[49] Woodrow Decl. ¶ 20.

[50] Mot. for Att'ys' Fees at 6–7.

compelled to mediate the case and were free to terminate the mediation or seek another mediator. It remains a mystery why counsel wasted so much time on this question of the conduct of a mediator they praise.

As we noted, the lodestar analysis, abbreviated as it may be, is a cross-check. Yet, reviewing billing entries is also helpful in assessing counsel's skill and efficiency. The documentation offered to support the lodestar amount reflects the time spent on various tasks and the need for certain tasks. In this case, consistent with our obligation to safeguard the interests of the class through a rigorous assessment of the settlement and the proposed fees, we have reviewed counsel's billing records to inform our analysis of the skill and efficiency factor. *See Sullivan*, 667 F.3d at 329; *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 730 (3d Cir. 2001).

Counsel needlessly duplicated tasks and wasted time on work that was not legally or factually relevant. It is doubtful that the result would have been any different if the case had been prosecuted by one firm rather than two. The redundant work and the time needlessly spent on issues unnecessary to accomplish the result suggest that counsel were not as skilled as they profess to be, were inefficient, or both.

<em>Complexity and Duration of the Litigation</em>

This case was not complex. It was simple and was resolved quickly. Settlement discussions began early without engaging in extensive discovery. Counsel reached a settlement framework within six months of filing the complaint after two mediation sessions.

Liability is not difficult to establish in a TCPA case like this one. Proving a statutory violation is easy. The plaintiff need only prove that the defendant made a call,

without the plaintiff's consent, within the United States (other than a call made for emergency purposes or made with the prior express consent of the called party), using an automatic telephone dialing system to any telephone number assigned to a cellular telephone service.  47 U.S.C. § 227(b)(1)(A)(iii).  Brown and Newby included copies of text messages on their cell phones, including their "STOP" responses,[51] from Rita's in their complaint.[52]  The only fact that had to be proven was that Rita's used an automatic telephone dialing system to send the text.  *See Dominguez v. Yahoo, Inc.*, 629 F. App'x 369 (3d Cir. 2015).  Thus, there was no need for extensive discovery.

TCPA litigation is neither challenging nor complex.  The simplicity of these cases suggests that a one-third fee may not be appropriate.  As one district court concluded, one-third fee awards in TCPA cases are not justified "in light of the repetitive nature of these actions and considering the amount of work actually performed by Counsel in relation to the settlements and/or judgments that have been obtained in other cases." *Machesney v. Lar-Bev of Howell, Inc.*, 292 F.R.D. 412, 425 (E.D. Mich. 2013), *on reconsideration*, No. 10-10085, 2016 WL 1394648 (E.D. Mich. Apr. 7, 2016); *see also Hawk Valley, Inc. v. Taylor*, 301 F.R.D. 169, 184 (E.D. Pa. 2014) (citing *Machesney*, 292 F.R.D. at 425).  The *Machesney* court noted, "Because cases like those pending before the undersigned are so similar, and Counsel have litigated so many of them, Counsel is able to recycle the same pleadings, discovery, research, motions, etc. in these cases." *Machesney*, 292 F.R.D. at 425 n.8.[53]

---

[51] Cell phone call recipients may revoke prior express consent.  *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 272 (3d Cir. 2013).

[52] 1st Am. Compl. ¶¶ 20, 29.

[53] *Machesney* and *Hawk Valley* concerned the adequacy of the class representative for class certification purposes.  Nevertheless, they do question fee awards in TCPA cases.

Brown's initial complaint suggests the use of a recycled form.  After referring to Brown with female pronouns throughout, the complaint states, "Neither Plaintiff nor his counsel has any interests which might cause them not to vigorously pursue this action."[54]

The lack of complexity and the short duration of the litigation weigh against a one-third fee award.  At the same time, we do not punish counsel for resolving the case early through mediation.

<em>Risk of Nonpayment</em>

Counsel argue they risked nonpayment.[55]  Risk of nonpayment exists in almost every case taken on a contingency basis.  *See McDonough v. Toys "R" Us, Inc.*, 834 F. Supp. 2d 329, 343 (E.D. Pa. 2011), *rev'd on other grounds*, *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163 (3d Cir. 2013).  The plaintiff may lose.  The defendant may not be financially able to satisfy a judgment.

There is no evidence that, at the time counsel undertook the case, they had any reason to believe that Rita's could go out of business.  *See Rite Aid*, 396 F.3d at 304. Later, it may have been suspected that it could not pay a large settlement or verdict.  At mediation, there was some discussion of Rita's' financial health and ability to pay a large settlement.[56]

We accept counsel's representation that there was a genuine concern that Rita's might not be able to pay a judgment or settlement.  Assuming Rita's may not have been

---

[54] Compl. ¶ 36.

[55] Mot. for Att'ys' Fees at 15.

[56] *See* Mot. for Att'ys' Fees at 12–13 ("Applied here, $3 million represents the maximum dollar amount Rita's could afford to pay.  Any greater amount would call into question the company's ability to continue as a going concern.") (footnote omitted); Suppl. Br. Ex. B.

able to pay a judgment or settlement, the risk of nonpayment favors counsel's request.

*Time Devoted to the Case*

According to billing records, counsel spent 1,498.5 hours on the case.[57]   For a simple case where liability is easy to prove, this amount of time appears excessive.   It suggests a lack of skill and efficiency.

As we found when considering the skill and efficiency factor, there were many hours spent on duplicative and irrelevant tasks.   Without reiterating our concerns, suffice to say that counsel cannot justify their requested fee through an inflated lodestar.   Thus, in determining the reasonableness of the attorney fees, we must reduce the lodestar to reflect the extent of the work that was necessary in light of the nature and circumstances of this simple TCPA case.

*Awards in Similar Cases*

In support of the proposed fee award, counsel cites eight TCPA cases and six Third Circuit consumer class actions in which the court awarded one-third of a common fund.[58]   These cases are not similar to this case.   Each case lasted longer than this case, which took nine months from the filing of Brown's initial complaint to preliminary approval of the settlement.   In one case, the court preliminarily approved settlement fourteen months after the complaint was filed.   Docket, *Lees v. Anthem Ins. Cos. Inc.*, Civ. No. 13-1411, 2015 WL 3645208 (E.D. Mo. June 10, 2015).   Another case, in which seventeen months passed from the complaint to settlement, involved extensive discovery.   *Hageman v. AT & T Mobility, LLC*, Civ. No. 13-50, 2015 WL 9855925, at *1

---

[57] *See* Suppl. Br. Exs. A, B, C.

[58] Mot. for Att'ys' Fees at 17–18.

(D. Mont. Feb. 11, 2015) (noting over 40,000 pages of documents produced and three depositions).  Other cases awarding a one-third fee lasted five, six, or even ten years from the complaint to preliminary approval of settlement.  *Landsman & Funk, P.C. v. Skinder-Strauss Assocs.*, 639 F. App'x 880, 881 (3d Cir. 2016) (six years); *Bridgeview Health Care Ctr., Ltd. v. Jerryclark*, Civ. No. 09-5601, 2015 WL 4498741, at *1 (N.D. Ill. July 23, 2015) (five years); Docket, *Smith v. Dominion Bridge Corp.*, Civ. No. 96-7580, 2007 WL 1101272 (E.D. Pa. Apr. 11, 2007) (ten years).

The common funds in those cases range widely from $16,000 to $39.75 million. *Bridgeview Health Care*, 2015 WL 4498741, at *1; *Bradburn Parent Teacher Store, Inc. v. 3M (Minn. Mining & Mfg. Co.)*, 513 F. Supp. 2d 322, 338 (E.D. Pa. 2007).  One case had only 663 class members.  *Spine & Sports Chiropractic, Inc. v. ZirMed, Inc.*, Civ. No. 13-489, 2015 WL 9413143, at *1 (W.D. Ky. Dec. 22, 2015).

Counsel offered three cases comparing the value of the settlement to the class with the proposed fee award.[59]  In each case, the fee awarded was less than one-third. *Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215, 236 (N.D. Ill. 2016) (rejecting counsel's requested 33.02% fee and instead awarding a lesser fee); *Ott v. Mortgage Inv'rs Corp. of Ohio*, Civ. No. 14-645, 2016 WL 54678, at *6 (D. Or. Jan. 5, 2016) (awarding counsel's requested 25% fee); *In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 808 (N.D. Ill. 2015) (awarding 20.77% fee).

What other courts have approved is not a benchmark.  *See Task Force Report*, 74 Temp. L. Rev. at 777.  Each case is different.  What was appropriate in one case may not be appropriate in a similar one.  *See Sullivan*, 667 F.3d at 333.  The Third

---

[59] Suppl. Br. at 2–3.

Circuit held in a TCPA case that attorney fees of one-third of a $625,000 common fund were appropriate.  *Landsman*, 639 F. App'x at 884–85.  Discussing the *Gunter* factors, the *Landsman* court noted "that class counsel are highly skilled and experienced in this type of litigation, they devoted hundreds of hours of work to what was a complex and heavily litigated case, they settled this case well before trial, and there was only a single objection to the fee award."  *Id.* at 884.  Unlike *Landsman*, this case was not complex and was not litigated.  Given these differences, the award in *Landsman* does not support the fee request here.

A one-third fee award is not uncommon in consumer class actions in the Third Circuit.  *McDonough*, 834 F. Supp. 2d at 343, *rev'd on other grounds*, *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163 (3d Cir. 2013).  However, "[a]pplication of the factors in Gunter has led to fee awards in many cases below what some have argued to be a 'benchmark' of 25%."  *Task Force Report*, 74 Temp. L. Rev. at 778; *see also id.* at 778 n.320 (reviewing sources).

Fees in small, low-risk consumer class actions are typically closer to 25%.  One study of class actions from 1993 to 2008 found an average fee percentage of 26.4% for $2.8 to $5.3 million settlement funds, and 24.7% in low-risk consumer class actions. Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993–2008*, 7 J. Empirical Legal Stud. 248, 265 (2010).  Another study of class action settlements in the years 2006 and 2007 found an average fee of 23.5% for consumer class actions, 25.2% for class actions in the Third Circuit, and 26.0% for class actions with $2.85 to $4.45 million settlement funds.  Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Award*, 7 J. Empirical Legal Stud. 811,

835–39 (2010).

In sum, although there have been cases awarding one-third fees, there also have been awards of 25% in small, low-risk, consumer class actions. Here, the result was not extraordinary, the litigation was simple and short, and redundant and unnecessary work was performed. These factors place this case in the category of cases where counsel were awarded fees less than one-third.

### Efforts of Other Groups

The benefits accruing to class members are attributable to class counsel and not to any other source. There was no government investigation of alleged TCPA violations. The benefits to the class are solely the result of this litigation. *See Prudential*, 148 F.3d at 337–38.

### Private Contingent Fee Arrangement

Undoubtedly, counsel could have demanded and received a one-third fee agreement before taking the case. They did not. There was no fee agreement. *See Prudential*, 148 F.3d at 340. Counsel claims that they "more likely would have negotiated a higher amount, such as 40%, which is more consistent with present-day contingency fees."[60] Counsel offers nothing to support this contention. This is not a personal injury or a collection action. Private fee agreements in TCPA class actions, such as those in *Machesney* and *Hawk Valley*, are viewed with skepticism. *See Machesney*, 292 F.R.D. at 425; *Hawk Valley*, 301 F.R.D. at 184.

How an attorney negotiates a contingent fee agreement with a class representative in a TCPA case is problematic. At that point, the putative class

---

[60] Mot. for Att'ys' Fees at 19.

representative has not been appointed and has no authority to bind the class to an agreement.  Prior to her appointment as class representative, a TCPA plaintiff has no leverage in negotiating a fee.  Any percentage of the potential recovery would not affect the class representative's incentive award.  In short, there is no arm's-length negotiation of the fee in these cases as there is in other types of cases.  Thus, we accord little weight to a "hypothetical" fee arrangement.  *See Prudential*, 148 F.3d at 340.

### Innovative Settlement Terms

There was nothing innovative about this settlement.  We reiterate that this was not an extraordinary settlement of a complex case.  There is no reason to enhance the fee.

### Lodestar Cross-Check Analysis

We have already discussed the role of the lodestar as a cross-check in the reasonable fee analysis and how it can be manipulated to inflate the multiplier.  Now, we proceed to perform the lodestar cross-check.

In determining the reasonableness of the time spent in a lodestar cross-check, a summary of hours, rather than the detail required to calculate the lodestar for a prevailing party award, normally suffices.  *Ins. Brokerage*, 579 F.3d at 280; *see also Task Force Report*, 74 Temp. L. Rev. at 776–77.  To perform the cross-check, we requested counsel's billing records.  *See Gunter*, 223 F.3d at 200.  The billing records informed our analysis of the skill and efficiency factor and the time spent factor.

Time spent on duplicative and irrelevant work inflates the lodestar, resulting in a higher benchmark and a smaller multiplier.  Accordingly, we deduct time spent on duplicative and unnecessary work.

The following hours billed are duplicative and irrelevant:

| Category | Hours |
|---|---|
| Taylor's and Peluso's preparation and attendance at mediation | 41.0 |
| Duplicative work handled by other firm | 20.5 |
| Analyzing financial documents without expert | 63.9 |
| Travel | 78.0 |
| Reviewing bills and paying costs | 13.6 |
| Researching "custard crisis" | 6.9 |
| Researching franchisees, competitors, and company officers in individual capacities | 27.5 |
| Response to petition for retroactive waiver never sent | 15.3 |
| Researching mediator ethics and alleged violations by mediator | 47.6 |

Based on our analysis of counsel's billing records, we find that at least one-quarter of the hours billed by counsel were not reasonable. Therefore, for the purposes of the lodestar cross-check, we shall reduce the 1,498.5 hours billed by counsel by 25%.

With respect to a reasonable hourly rate for the lodestar cross-check, we "apply blended billing rates that approximate the fee structure of all the attorneys who worked on the matter." *Rite Aid*, 396 F.3d at 306. Counsel cited four cases, including two from this court, to support the rates charged by partners, associates, and paralegals.[61] *See*

---

[61] Lemberg Decl. ¶ 26.

*McGee v. Ann's Choice, Inc.*, 2014 WL 2514582, at *6 (E.D. Pa. June 4, 2014) (approving rates of $350 for associates and $500 for partners); *Alexander v. Coast Prof'l Inc.*, 2016 WL 861329, at *8 (E.D. Pa. Mar. 7, 2016) (approving a blended hourly rate of $420).

The rates billed by attorneys and paralegals in this case are reasonable. Partners billed at a rate between $330 and $500 an hour. Associates billed at the rate of $250 to $450 an hour. The paralegal rate was $125.[62] Because counsel's total bill includes the hours worked and rates charged by each professional, we determine the blended hourly rate by dividing the total bill by the total hours worked. As a result, the blended hourly rate ($591,484 bill divided by 1,498.5) is $394.72.

In sum, the reasonable hours spent is 1,123.9 hours and the blended hourly rate is $394.72. Therefore, the lodestar is $443,625.81.

*Multiplier*

To determine the multiplier, we divide the requested fee by the lodestar. In common fund cases, the multiplier reflects the measure of the quality of the attorneys' work and the result they achieved for the class. *See Ins. Brokerage*, 579 F.3d at 280 (quoting *Rite Aid*, 396 F.3d at 306). Here, counsel requests an award of $959,926.03. Dividing the $959,926.03 request by the $443,625.81 lodestar yields a 2.16 multiplier. In the motion for attorney fees, counsel had calculated a 1.47 multiplier based on a higher lodestar. Because we determined that the lodestar was inflated, the actual multiplier is higher than requested.

Multipliers between one and four are not uncommon in common fund cases.

---

[62] Mot. for Att'ys' Fees at 21.

23

*Prudential*, 148 F.3d at 341.  At the same time, the Third Circuit "strongly suggest[ed] that a lodestar multiplier of 3 . . . is the appropriate ceiling for a fee award, although a lower multiplier may be applied in the District Court's discretion."  *Cendant PRIDES*, 243 F.3d at 742.

It is not uncommon for courts to award multipliers of less than one.  *E.g.*, *Ins. Brokerage*, 579 F.3d at 284–85 (affirming 0.4 multiplier); *Alexander*, 2016 WL 861329, at *8 (approving requested fee "substantially less than the calculated reasonable lodestar").  The Third Circuit concluded that a 1.28 multiplier in a case involving "significant time and effort devoted to the case by class counsel" was appropriate.  *In re AT & T Corp.*, 455 F.3d 160, 173 (3d Cir. 2006).  As previously stated, "when the multiplier is too great, the court should reconsider its calculation under the percentage-of-recovery method, with an eye toward reducing the award."  *Ins. Brokerage*, 579 F.3d at 280 (quoting *Rite Aid*, 396 F.3d at 306).

Counsel has not justified a 2.16 multiplier.  Counsel's original request of a 1.47 multiplier, in light of the *Gunter* and *Prudential* factors, is more appropriate.  A 1.47 multiplier results in an award reflecting the work reasonably performed and the result achieved.

### *Fee Award*

Considering the *Gunter* and *Prudential* factors, we conclude that a fee award of 21.7% of the settlement fund is appropriate in this case.  A 21.7% award is slightly lower than the average awards in similar small, low-risk consumer class actions.  *See* Eisenberg & Miller, *supra*, at 265; Fitzpatrick, *supra*, at 835–39.  However, this number is consistent with the percentage-fee analysis of the *Gunter* and *Prudential* factors,

especially taking into consideration the duplicative and irrelevant work performed by counsel, the short duration of the case, and the simplicity of TCPA litigation.

Counsel's inflated lodestar resulted in a 2.16 multiplier, which is higher than the 1.47 multiplier originally proposed by counsel. The lower 1.47 multiplier is more appropriate. Multiplying the calculated lodestar by the 1.47 multiplier yields attorney fees of $651,000.

Reducing attorney fees in this case will increase claimants' recovery. The settlement requires Rita's to fund the entire three-million-dollar settlement.[63]  The reduction of attorney fees to $651,000 will increase the net settlement fund by more than $300,000, enhancing the benefit to the class. For the 28,137 claimants who did not attempt to unsubscribe, their individual recoveries will increase by almost $10 each, from $56.81 to $66.54. For the 386 claimants who did attempt to unsubscribe, their individual recoveries will increase by more than $100 each, from $625.01 to $731.99.[64] Although these recoveries do not reach the amounts initially anticipated by counsel, claimants will receive greater benefits.

### Expenses

Attorneys who create a common fund are entitled to reimbursement of their reasonable expenses from the fund. *In re Ikon Office Sols., Inc., Sec. Litig.*, 194 F.R.D. 166, 192 (E.D. Pa. 2000) (citing *Lachance v. Harrington*, 964 F. Supp. 630, 651 (E.D. Pa. 1997)); *see also Gen. Motors*, 55 F.3d at 820 n.39. Here, the request for litigation expenses is reasonable.

---

[63] Settlement Agmt. at 11, 13.

[64] These revised calculations take into account that we authorize the payment of an additional $75,000 in settlement administrative costs. *See supra* note 27.

The class representatives have provided sufficient support for their expenses. The attorneys each submitted invoices identifying the expenses for which they request reimbursement.[65]  These expenses generally fall within several categories: filing and service fees, postage and delivery, mediation fees, expert fees, local counsel fees, and travel expenses, including airfare, taxis, parking, and reasonable meals.  The class representatives gave notice that they were seeking expenses as part of the one million dollars in attorney fees and expenses.[66]  *See In re Aetna, Inc.*, No. Civ. A. MDL 1219, 2001 WL 20928, at *13 (E.D. Pa. Jan. 4, 2001) (limiting reimbursement of expenses to amount in notices to class members).  Because these expenses are reasonable, we shall allow $40,073.97 in expenses.

### Class Representative Incentive Awards

The two class representatives request incentive awards of $5,000 each, the maximum award allowed under the settlement.[67]  Class representative incentive awards are not uncommon in common-fund class actions.  *Sullivan*, 667 F.3d at 333 n.65; *see also Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 145 (E.D. Pa. 2000).  These awards seek to compensate named plaintiffs for services provided, risks taken, and contributions to the enforcement of laws.  *Sullivan*, 667 F.3d at 333 n.65; *Cullen*, 197 F.R.D. at 145.

In ordering class representative incentive awards, courts consider a number of factors, including:

---

[65] Woodrow & Peluso, LLC, Expense Report (Doc. No. 46-1) at ECF 21; Lemberg Law LLC, All Transactions (Doc. No. 46-1) at ECF 34.

[66] Peters-Stasiewicz Decl. Ex. A at 3; Peters-Stasiewicz Decl. Ex. B. at 2.

[67] Settlement Agmt. at 32.

> [T]he risk to the plaintiff in commencing suit, both financially and
> otherwise; the notoriety and/or personal difficulties encountered by the
> representative plaintiff; the extent of the plaintiff's personal involvement in
> the lawsuit in terms of discovery responsibilities and/or testimony at
> depositions or trial; the duration of the litigation; and the plaintiff's personal
> benefit (or lack thereof) purely in his capacity as a member of the class.

*Reibstein v. Rite Aid Corp.*, 761 F. Supp. 2d 241, 257 (E.D. Pa. 2011) (quoting *Perry v. FleetBoston Fin. Corp.*, 229 F.R.D. 105, 118 (E.D. Pa. 2005)).   We must "carefully review" requests for class representative incentive awards when they come from common funds available to the class.   *Altnor v. Preferred Freezer Servs., Inc.*, Civ. No. 14-7043, 2016 WL 3878161, at *17 (E.D. Pa. July 18, 2016) (quoting *Varacallo v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207, 257 (D.N.J. 2005)).

Describing the class representatives as "exemplary," counsel state that they assisted the investigation by "providing counsel with valuable information relating to their receipt of Cool Alerts messages," making the "time commitment," and asking "questions about the case and proceedings to ensure they were adequately protecting class member interest."[68]   Counsel has not explained the services provided or risks taken by Brown and Newby with any greater specificity.   Counsel's billing records, however, reveal that Brown and Newby prepared documents for the case, responded to discovery requests, and, Newby in particular, kept in touch regarding case status.[69]

The class representatives did not face any risk, financial or otherwise, arising from their participation in the case.   However, they remained involved and participated in discovery, as limited as it was.   The class representatives request incentive awards eight times greater than the class members who received Cool Alerts after responding

---

[68] Woodrow Decl. ¶ 36.

[69] Suppl. Br. Exs. A, B, C.

"STOP."   Given the class representatives' active participation, this difference is not unreasonable.   Therefore, we shall grant the class representatives' request for incentive awards.

## Conclusion

We shall grant the motion to the extent that it requests an award of $40,073.97 in expenses and $10,000 in class representative incentive awards.   We shall grant the motion for attorney fees.   However, we shall not award the amount sought.   Instead, we shall award attorney fees in the amount of $651,000, 21.7% of the settlement fund.

/s/ Timothy J. Savage
TIMOTHY J. SAVAGE, J.