IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHERRY BROWN and ERICKA NEWBY, | : | CIVIL ACTION |
| on their own behalf and on behalf of | : | |
| all others similarly situated | : | |
| | : | |
| v. | : | |
| | : | |
| RITA'S WATER ICE FRANCHISE | : | |
| COMPANY LLC | : | NO. 15-3509 |

## MEMORANDUM OPINION

**Savage, J.**                                                                                      September 14, 2017

Class representatives Sherry Brown and Ericka Newby move for approval authorizing the Settlement Administrator to disperse payments to eligible class members. They make the request because there are 18,359 fewer valid claim forms than the Settlement Administrator and plaintiffs' counsel had originally represented at the final approval hearing. The Settlement Administrator has since determined that there are only 10,164 valid and non-duplicative claim forms rather than 28,523. Plaintiffs have filed the motion to "apprise the Court of this development and obtain final approval for payment of properly submitted, and verified, claims to the actual class members in this case."

Because the class members eligible for a payout will receive larger awards than had been contemplated, we shall grant the motion and supplement the Findings of Fact in this class action settlement to reflect the correct number of eligible class members.

**Background**

In this Telephone Consumer Protection Act class action, the complaint alleged that Rita's knowingly or willfully sent class members unauthorized, automated text messages known as "Cool Alerts," which announced when certain flavors of products such as water ice, custard, and ice cream became available in the recipient's local store. The plaintiffs claimed that Rita's generated the messages using a list or database of telephone numbers of persons who had not provided them to the defendant, continued to send Cool Alerts to customers even after they had texted "STOP" in response to the texts' instructions, and used outdated and insufficient consent language on its Cool Alerts webpage.

The parties reached a settlement agreement, which was preliminarily approved on March 23, 2016. The settlement agreement required Rita's to create a three-million-dollar Settlement Fund, out of which notice and administration costs, class representative incentive awards, and attorneys' fees and expenses were to be paid. The remainder was the Net Settlement Fund, from which class members who submitted a valid and timely claim form were to receive a *pro rata* share, the amount depending on whether they received just one Cool Alert text message or also received at least one other Cool Alert after responding "STOP" to a previous text. The settlement agreement allowed Class Counsel to seek attorneys' fees and expenses up to one million dollars.

At the preliminary approval hearing, Class Counsel informed the court that based on the number of telephone numbers they had, there were approximately 138,000 potential class members. Culling this initial list, the Settlement Administrator, A.B. Data, Ltd., found that there were approximately 132,140 unique telephone numbers. Of

those, there were 110,328 unique names and addresses, who were sent class notice by mail. Decl. of Christine Peters-Stasiewicz (Doc. No. 50-4) ("Peters-Stasiewicz Decl."), ¶¶ 9-10. As of July 14, 2016, six days after the claim form filing deadline and twelve days before the final approval hearing, the Settlement Administrator submitted a declaration stating that class notices were mailed successfully to 106,493 persons, and that 30,636 timely claim forms had been submitted. *Id.* ¶¶ 16, 19. After conducting a "preliminary review" of the timely submitted claim forms, the Settlement Administrator determined that 28,523 claim forms were non-duplicative. *Id.* ¶ 19. Of that group, 28,137 received one Cool Alert text message and 386 received at least one additional Cool Alert after responding "STOP" to a previous text. *Id.* ¶ 20. The Settlement Administrator also represented that the 28,523 claim forms were "undergoing additional reviews," and that it would "coordinate to provide the parties with *updates* to mailing, claims and correspondence statistics following the complete claims and auditing processing once all claims received/postmarked by the July 8, 2016 deadline are fully reviewed." *Id.* ¶¶ 19, 23 (emphasis added).

Based on the representation by A.B. Data that 28,523 valid claim forms had been submitted, Class Counsel boasted an "outstanding" claims rate of 20.6% of the class,[1] much higher than their expected five to six percent response rate. Mot. for Final Approval of Class Action Settlement (Doc. No. 50-3) at 2, 8, 12-13 ("Each of these claims represents an affirmative vote in favor of the Settlement, and . . . [w]hen considered against the total number of notices sent, the claims rate in this case (20.6%)

---

[1] This figure was based on 138,000 class members. The rate increases to almost 26% if based on the 110,328 unique names and addresses identified by the fund administrator after preliminary approval. *See* Peters-Stasiewicz Decl. ¶ 10.

is far above the rates seen in typical consumer class action settlements" of 2-8%); Mot. for Preliminary Approval (Doc. No. 43-2) at 25; Oral Arg. Tr. at 26:25-27:1-19. Indeed, at the final approval hearing, counsel stated:

> I'm willing to wager that there is no [TCPA] settlement out there . . . with a higher claims rate than ours. . . . This is [a] 20.6% claims rate. There is nothing out there like this. . . . This is [an] outstanding settlement. . . . This is the gold standard of TCPA settlements . . . because we have over 20% claims rate, 28,523 claims. Getting 28,000 people to do anything, that actually requires them to write or fill something out is moving a glacier and we did it here. . . .

Oral Arg. Tr. at 9:8-13, 17-23 (July 26, 2016). Emphasizing the 20.6% claims rate, Class Counsel requested approval of an award of attorneys' fees and expenses in the amount of one million dollars, which was one-third of the settlement fund and the maximum amount allowed under the settlement agreement. *See* Pls.' Suppl. Br. in Supp. of Pls.' Mot. for Reasonable Att'ys' Fees & Costs (Doc. No. 55) ("Suppl. Br.") at 2 ("The 20.6% claims rate reflects the excellent efforts of Class Counsel (in negotiating a strong result and developing an effective notice plan) and the overwhelming approval of the class.").

The amount each class member would recover depended on the number and type of claimants.[2] Consequently, at the final approval hearing, we questioned Class Counsel extensively about the claims rate and the amount they were expecting each class member to recover when they negotiated the three-million-dollar settlement, and how that compared to the actual claims and recovery rate of the 28,523 claimants

---

[2] Additionally, the Net Settlement Fund, which constituted the total amount available to the class as a whole, would be affected by the size of the attorney fee award and administration costs.

4

entitled to a cash payment. Oral Arg. Tr. at 11:1-12, 24-25–12:1-14; 27:2-25 - 28:1-5, 14-16; 29:12-18.

On March 16, 2017, we granted final approval of the class action settlement, where we: (1) awarded Class Counsel a total of $691,074.00 in attorneys' fees and expenses; (2) allowed the Settlement Administrator $144,000.00 to cover class administration costs; (3) awarded $66.54 to each of the 28,197 class members who received just one Cool Alert; and (4) awarded $731.99 to each of the 386 class members who received a Cool Alert after texting "STOP." *See* Final Approval Order (Doc. No. 59) ¶¶ 5(a), 6; Findings of Fact and Conclusions of Law (Doc. No. 58) ¶ 32; Doc. No. 57, ¶¶ 1-2; Attorneys' Fees Op'n (Doc. No. 56) at 6 n.27.

Now, four months after the court approved the class action settlement, and more than one year after the Settlement Administrator promised to "update" the parties with the results of its "full review" of the claims received and postmarked by the July 8, 2016 deadline, A.B. Data reports a significant reduction in the number of valid claim forms despite receiving 1,364 additional claim forms[3] since submitting its earlier declaration on July 14, 2016. *See* Decl. of Eric Schachter ("Schachter Decl.") (Doc. No. 60-1) ¶¶ 2, 5. Specifically, A.B. Data reports that after completing a full review of all claim forms received,[4] it has determined that it has received only 10,164 valid and non-duplicative

---

[3] Although A.B. Data fails to state the number of newly submitted claim forms or whether they were timely submitted by being postmarked or received by the claim-filing deadline of July 8, 2016, we arrive at this number based on its statements in its recent declaration that it continued to receive claim forms after the earlier declaration was filed and that a total of "approximately 32,000 claim forms [were] received," Schachter Decl. ¶¶ 4, 6, and its statement in the July 14, 2016 declaration that 30,636 claim forms were timely submitted. Peters-Stasiewicz Decl. ¶ 19.

[4] The method A.B. Data employed to determine which claim forms were non-duplicative and eligible for a class payment was to compare the name, mailing address and phone number on each claim form to the names and mailing addresses that were sent class notice and to the list of telephone numbers sent a Cool Alert text. Schachter Decl. ¶¶ 4, 5.

claim forms,[5] which is 18,359 fewer than the 28,523 number A.B. Data had reported as valid in July 2016. Of the valid claim forms, 9,684 class members received one Cool Alert text message and 480 received at least one additional Cool Alert after responding "STOP" to a previous text. Schachter Decl. ¶ 7.

Based on the reduced number of valid claim forms, the total number of award units is 14,964. Schachter Decl. ¶ 7.[6] The value of each award unit is $144.00,[7] which means that 9,684 class members are each entitled to receive an award of $144.00 and 480 class members, $1,584.00. The award amounts applied in the Findings of Facts were $66.54 to 28,137 class members and $731.99 to 386. (Doc. No. 58) ¶ 32(f).

The large discrepancy between A.B. Data's initial determination that 28,523 valid claim forms were received and its updated determination that there were only 10,164, means each claimant will recover more than double the amount previously ordered. To account for this mistake, the plaintiffs have filed a motion requesting the court to approve dispersal of funds based on the new data and values.

## Discussion

Six days after the claim form filing deadline and twelve days before the final approval hearing, A.B. Data, the Settlement Administrator, submitted a declaration stating that it was "conducting additional reviews of" 28,523 non-duplicative claim forms

---

[5] Of the 32,000 claim forms received, 25,995 were submitted online. Of those online submissions, 20,250 were determined to be either duplicative of other valid claim forms or invalid because they were not class members (their information did not match the class data). Schachter Decl. ¶ 6.

[6] The award units are calculated as follows: 9,684 x 1 = 9,684 and 480 x 11 = 5,280; 9,684 + 5,280 = 14,964.

[7] The value of each award unit is calculated as follows: $2,154,926.03 (Net Settlement Fund) ÷ 14,964 = $144.00.

6

that had been submitted, and would "coordinate to provide the parties with updates to mailing, claims and correspondence statistics following the complete claims and auditing processing once all claims received/postmarked by the July 8, 2016 deadline are fully reviewed." *Id.* ¶¶ 19, 23. This declaration would turn out to be misleading. A.B. Data did not "fully review" the claim forms until after the settlement was approved.

Both the court and Class Counsel relied on A.B. Data's statements in its July 14, 2016 declaration. Based upon those representations, Class Counsel boasted an "outstanding" claims rate of 20.6% of the class. This information provided in the declaration was used to calculate the award amounts to eligible class claimants. The amount each class member can recover depends on the total number and type of actual claimants who will receive proportionate shares of the Net Settlement Fund. Consequently, a decrease in the number of valid claimants from 28,523 to 10,164, a decrease of sixty-five percent (65%), will significantly increase the amounts of the awards to the class members.

Plaintiffs contend that the Settlement Administrator "identified an unusually high number of false claims submitted through the online claim portal." Pls.' Mot. to Approve Class Disbursement ¶ 1. Although there were a large number of claims submitted online that were ultimately determined to be invalid,[8] neither Class Counsel nor the Settlement Administrator has provided the court with any data showing that it is unusual

---

[8] The Settlement Administrator found that 20,250 of 25,995 claims submitted online (77.9%) were either duplicative of other valid claim forms or invalid because their information did not match the class data. Schachter Decl. ¶ 6.

to have a large number of invalid claims submitted online in these types of class actions.[9]

Even if it were unusual to have so many invalid online claims, as Class Counsel suggests, A.B. Data should have conducted its full review of the valid claim forms immediately. If it knew or suspected that it would not be able to complete its full review before the final approval hearing, it should have notified the court. In that event, the calculation of the award amounts and the ruling on the counsel fees petition could have been postponed.

The plaintiffs note that Class Counsels' fee was reduced, in part, because each claimant was going to receive less than counsel anticipated due to the number of claimants exceeding counsel's estimates. Mot. to Approve Class Disbursement, ¶ 11. Class Counsel had initially projected a five-to-six percent (5-6%) claims rate, and estimated a payout of approximately $150.00 for the one award unit group members and $1100.00 for the 11 award unit group members. Oral Arg. Tr. at 27:2-25 - 28:1-2. With these new figures, the claims rate is 7.3%,[10] and the awards to the different group members are $144.00 and $1,584.00, respectively. Plaintiffs point out that these rates and award amounts are much closer to those originally predicted by counsel.

Plaintiffs are correct that if we apply the new number of valid claim forms, counsel's initial projections of claims rate and payout amounts to eligible claimants will be closer to the new award amounts. Class Counsel boasted that the claims rate of 20.6% was the highest in any TCPA case, an "outstanding" settlement and the "gold

---

[9] Additionally, the Settlement Administrator did not state that they were "false" claims. It stated that they were either duplicative of other valid claim forms or contained a name, address or phone number that did not match the class list. These are not necessarily "false" claims.

[10] 10,164 ÷ 138,000 = 7.3%.

standard" of TCPA settlements, and how having gotten 28,000 people to submit a claim was akin to "moving a glacier." We now know, as Class Counsel should have known then, that the settlement was not as remarkable as Class Counsel had bragged.

**Conclusion**

The Settlement Administrator should have conducted the full review of the claim forms as soon as the claim filing deadline passed instead of waiting for the final approval order to be issued. However, because the eligible class members will receive a greater benefit, we shall grant the motion and supplement the Findings of Fact to reflect the correct number of valid claim forms submitted.